Thomas J. Salerno (AZ Bar No. 007492) thomas.salerno@squiresanders.com
Bradley A. Cosman (AZ Bar No. 026223) bradley.cosman@squiresanders.com
K. Derek Judd (AZ Bar No. 028565) derek.judd@squiresanders.com
**SQUIRE SANDERS (US) LLP**
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
(602) 528-4000

Proposed Counsel to Debtor-In-Possession

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| In re<br><br>APACHE JUNCTION HOSPITAL, LLC,<br><br>                Debtor. | Chapter 11 Case<br>Case No. 4-13-bk-18188-EWH<br><br><br>**OMNIBUS STATEMENT OF FACTS AND DECLARATION OF G. GRANT LYON IN SUPPORT OF FIRST DAY PLEADINGS**<br><br>**Date of Hearing: TBD** |

G. Grant Lyon under penalty of perjury, states:

1.       I am the Chief Restructuring Officer ("**CRO**") of Apache Junction Hospital, LLC (the "**Debtor**"). I make this affidavit on personal knowledge in my capacity as the Debtor's CRO in connection with the Debtor's voluntary petition for relief under chapter 11,[1] filed on October 11, 2013 (the "**Petition Date**"). The statements set forth below are true to the best of my personal knowledge and if called to testify to those statements, I would do so competently.[2]

---

[1]     Unless otherwise indicated, all chapter and section references in this Motion are to THE Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* All "Rule" references are to the Federal Rules of Bankruptcy Procedure.
[2]     Some of the information contained in this Declaration was provided to me by representatives of the Debtor, which I have relied on for purposes of preparing this Declaration.

2.     This Declaration is submitted in support of factual allegations contained in the following motions (the "**First-Day Pleadings**"), filed contemporaneously with this Declaration:[3]

- Emergency Motion for an Order: (A) Authorizing the Debtor to Pay or Honor Certain Prepetition Claims for Wages and Employee Benefits; and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests

## OMNIBUS STATEMENT OF FACTS

**Description of the Debtor**

3.     On October 17, 2013, the Debtor filed a voluntary petition in this Court for relief under chapter 11.

4.     The Debtor is an Arizona limited liability company with its principal place of business in Pinal County, Arizona. Accordingly, venue for the Debtor's chapter 11 case is proper in this District under 28 U.S.C. §§ 1408 and 1409.

5.     The Debtor is organized under the laws of Arizona. As explained in further detail below, the Debtor formerly operated two hospital facilities, one in Pinal County, Arizona and another in Maricopa County, Arizona. Until early April 2013, the principal executive offices of the Debtor were located at 515 North Mesa Drive, Mesa, Arizona 85201. Following the Debtor's prepetition wind-down and asset sale (discussed below), the Debtor ceased operating from its former executive offices and now leases space at 1690 West Southern Avenue in Apache Junction, Arizona.

**Background on the Debtor and the Debtor's Prepetition Wind-Down and Asset Sale**

6.     In 2008, the Debtor re-opened a hospital in Mesa, Arizona formerly operated as Mesa General Hospital. The Debtor operated at the Mesa location under a nonresidential real

---

[3]     All capitalized terms not defined in this Declaration have the same meanings ascribed to them in the corresponding pleadings.

property lease (the "**Mesa Lease**") with Sierra Equities, Inc. ("**Sierra Equities**") as lessor. The Mesa location was a full service hospital with 80 beds and as many as 300 employees.

7.      The Debtor also opened another full service hospital in Apache Junction, Arizona. The Debtor operated the Apache location under a nonresidential real property lease (the "**Apache Lease**") with Gracus Realty, LLC ("**Gracus Realty**") as lessor. The Apache location contained 30 hospital beds and up to 150 employees. The Debtor also utilized the Apache location to operate catheterization laboratories and provide other related services. At both the Mesa location and the Apache location, the Debtor operated under various equipment leases with Gracus Leasing, LLC ("**Gracus Leasing**") as lessor.[4]

8.      The driving force behind the Debtor's successful operations was Dr. Robert Siegel, M.D., a renowned cardiologist and entrepreneur. Both the Mesa Location and the Apache Location thrived under Dr. Seigel's leadership, with each location consistently operating at a profit. For the year ending December 2011, Debtor collectively generated approximately $210,000,000 in annual revenues, before accounting for insurance discounts.

9.      Tragically, in April of 2012, Dr. Siegel passed away unexpectedly in a plane accident. The loss of Dr. Siegel's leadership had an immediate negative impact on the Debtor's operations. Indeed, the Debtor's revenues decreased dramatically in the second and third quarters of 2012.

10.      By October of 2012, the Debtor's financial condition had deteriorated to such a dramatic extent that the Debtor was facing the imminent possibility of missing payroll and other key operating costs. In response, the Debtor was forced to seek short-term financing in

---

[4]      Gracus Realty and Gracus Leasing are affiliates of the Debtor. Gracus Realty and Gracus Leasing are entities wholly-owned by Barbara Barker (Siegel), M.D., who is the Debtor's majority interest holder and the former spouse of Dr. Robert Siegel, M.D.

November 2012 from Marrick Business Finance, LLC ("**Marrick**"). Specifically, the Debtor obtained a $3,000,000 loan (the "**Marrick Loan**") to cover operating costs. The Debtor was required to repay the Marrick Loan in full, with a 25% factoring fee, in nine months.

11.    Although the Marrick Loan provided the Debtor with temporary relief, the Marrick Loan was not sufficient to solve the Debtor's broader financial difficulties. In fact, the Marrick Loan could do little more than assist the Debtor in covering payroll, which in late 2012 was running approximately $700,000 per pay period. Within weeks of obtaining the Marrick Loan, the Debtor had exhausted all amounts it received on payroll and related expenses.

12.    Meanwhile, in late 2012 and early 2013, the Debtor's financial situation continued to deteriorate. The Mesa location's average occupancy had dwindled to less than 10%, with only half of these patients paying their resulting hospital bills. The Apache location experienced a similar decrease in occupancy. Further, in late 2012 the Debtor had accrued unpaid payroll tax liabilities of approximately $1 million (the "**Tax Payable**").

13.    In early 2013, liquidity shortages forced the Debtor to cease making payments under the Marrick Loan. In response, Marrick exercised its rights under the Marrick Loan to have all receivables sent directly to Marrick. Of course, this exasperated the Debtor's liquidity shortage. Marrick's interception of receivable collections left the Debtor without the cash receipts necessary to pay outstanding trade payables, which at the time totaled several million dollars. Based on the Debtor's failure to pay amounts outstanding, several of the Debtor's most critical vendors threatened to cut off further supply of goods and services to the Debtor. The goods and services provided by these vendors were vital to the Debtor's ability to continue operating and providing essential healthcare services. Accordingly, the Debtor focused its attention on negotiating continued provision of goods and services from such critical vendors.

14. Many of the Debtor's vendors were supportive of the Debtor's efforts. Notwithstanding, it became readily apparent that projected cash flows for both the Debtor's locations would be insufficient to cover current operating costs, let alone repay the past due obligations to trade creditors or the approximately $2,700,000 owed under the Marrick Loan.

15. In addition to the outstanding liabilities to trade creditors and the outstanding balance under the Marrick Loan, the Debtor had fallen behind and was in continuing monetary default under both the Mesa Lease and the Apache Lease. Consequently, in April 2013, Sierra Equities filed an action in the Maricopa County Superior Court for appointment of a receiver over the Mesa location. On April 11, 2013, the superior court entered an order appointing Sierra Consulting Group, LLC[5] as receiver (the "**Receiver**").

16. By the time the Receiver was appointed, the Debtor had ceased all operations at the Mesa location. Various pieces of the Debtor's medical and related equipment, however, remained at the Mesa location (the "**Mesa Equipment**"). On September 4, 2013, the Receiver reached an agreement with Florence Medical Alliance, LLC ("**FMA**") for the sale of the Mesa Equipment (the "**Equipment Sale Agreement**"). The agreed purchase price for the Mesa Equipment was $275,000. Pursuant to the Equipment Sale Agreement, FMA paid the Receiver $100,000 in cash and executed a promissory note in favor of the Receiver in the original principal amount of $175,000 and due in full by, at the latest, November 30, 2013 (collectively, the "**Equipment Sale Proceeds**"). The Equipment Sale Proceeds are being held by the Receiver and are property of the Debtor's bankruptcy estate.[6]

---

[5] Sierra Consulting Group is unrelated to Sierra Equities.
[6] Sierra Equities asserted a landlord's lien on the Mesa Equipment and, upon information and belief, may assert an interest in the Equipment Sale Proceeds. The Debtor reserves all rights to object to or otherwise challenge the landlord's lien asserted by Sierra Equities, including, but not limited to, through the filing of an avoidance action.

17.     In light of the pressures on the Debtor's business, and after extensive consultation amongst the Debtor's directors, officers, and financial advisors, the Debtor determined to market the Debtor's remaining business (essentially the Apache location) for sale. To this end, the Debtor retained Bruce Kelley of First Southwest to market the Debtor's business to strategic buyers.

18.     Mr. Kelley, in consultation with the Debtor, contacted a number of entities to gauge interest in the acquisition. Despite extensive marketing efforts, no one expressed an interest in the Mesa location. Both IASIS Healthcare, LLC ("**IASIS**") and Banner Health ("**Banner**") did express interest, however, in acquiring the Apache location. This interest stemmed, in part, from the fact that both IASIS and Banner own nearby facilities and, consequently, would not be required to assume the Debtor's Medicare provider number in order to operate at the Apache location.

19.     The Debtor entered into non-disclosure agreements with IASIS and Banner, and provided financial and operating information to IASIS and Banner pursuant to these agreements. The Debtor offered an exclusive arrangement to either IASIS or Banner on the condition that IASIS or Banner provide an immediate working capital loan to the Debtor.

20.     Despite showing strong initial interest, IASIS ultimately declined to pursue a transaction. Banner, however, made an offer to the Debtor to provide a working capital loan for the Debtor and to purchase the Apache location from the Debtor for approximately $7,600,000. After extensive arm's-length negotiations, this offer was raised to $10,000,000.

21.     Banner provided the Debtor a working capital loan through the *Loan Purchase Agreement* (the "**Loan Agreement**") entered into between Banner and Marrick on April 24, 2013. As provided in the Loan Agreement, Banner satisfied in full the $2,700,000

owed by the Debtor to Marrick and provided $1,500,000 to the Debtor. In separate but interrelated transactions, the Debtor executed two promissory notes in favor of Banner, one in the approximate amount of $2,700,000, and another in the approximate amount of $1,500,000 (collectively, the "**Notes**").

22.     In connection with the Loan Agreement and the Notes, the Debtor, Gracus Realty, Gracus Leasing and Banner also entered into a series of asset purchase and sale agreements for the purchase of the Apache location and related assets, each dated May 23, 2013 (collectively, the "**Sale Agreements**"). The total purchase price for the Apache location and related assets under the Sale Agreements was $10,000,000. Of the $10,000,000 purchase price: (i) approximately $4,200,000 was used to satisfy the Debtor's Notes in full; (ii) approximately $455,000 was used to satisfy the then-remaining outstanding amount of the Tax Payable; (iii) approximately $200,000 was used to satisfy the broker fee owed to Mr. Kelley; (iv) approximately $4,200,000 went to Gracus Realty for the real property and related improvements; (v) approximately $200,000 went to Gracus Leasing for certain medical equipment at the Apache location; (vi) approximately $175,000 went to former employees of the Debtor to satisfy their then-remaining outstanding claims for paid time off; and (vii) the remaining $500,000 went to the Debtor.

23.     Through the Loan Agreement and the Sale Agreements, all of the interests of the Debtor and Gracus Leasing in the Apache location, including the real property, the building on the real property, and all physical assets contained at the Apache location, were transferred to Banner. Moreover, the Loan Agreement and the Sale Agreements allowed the Debtor to extinguish the Debtor's obligations under the Marrick Loan and the Tax Payable, while further adding approximately $500,000 of cash on hand. In addition, under the Sale Agreements the

Debtor retained its interest in all outstanding accounts receivable that the Debtor had generated at the Apache location.

24.    Following closing of the Loan Agreement and Sale Agreements, and as of the Petition Date, the Debtor's assets primarily comprised: (1) approximately $1,100,000 in cash (the "**Cash**"); (2) a small amount of remaining patient receivables for the Mesa location and the Apache location (the "**Receivables**");[7] (3) the Equipment Sale Proceeds, which, as set forth above, total $100,000 in cash and the balance owing under a promissory note in the original principal amount of $175,000; and (4) miscellaneous claims with a combined estimated value range between approximately $50,000 and $1,000,000.

25.    As of the Petition Date, the Debtor is no longer operating any health care facilities at the Mesa location, the Apache location, or elsewhere.[8] The Debtor currently has just six employees, all of which are assisting the Debtor in collecting outstanding accounts receivable, processing claims, and otherwise assisting the Debtor in its wind-down process.

## THE DEBTORS' CAPITAL STRUCTURE

26.    The Debtor does not have any secured creditors. Under the Loan Agreement and the Sale Agreements, all of the Debtor's secured indebtedness was satisfied in full. The Debtor's remaining creditors are principally limited to prepetition vendors, former landlords, and other similarly situated unsecured creditors.

27.    The Debtor's equity ownership structure, which includes all entities owning 5% or more of each class of equity in the Debtor, is as follows:

---

[7]    The Debtor utilizes the services of Delivery Financial Services, LLC, a medical account receivable management company, to assist in the collection of the Receivables.

[8]    The Debtor had ceased all operations at the Mesa location as of April 11, 2013, and had ceased operations at the Apache location as of May 23, 2013, the date of the Sale Agreements.

Case 4:13-bk-18188-EWH    Doc 4    Filed 10/17/13    Entered 10/17/13 16:05:14    Desc
Main Document    Page 8 of 26

| Shareholder | Percentage of Shares |
| --- | --- |
| **Class A Shares** | |
| Barbara Barker | 100% |
| **Class B Shares** | |
| Ross McArthur | 33% |
| Barbara Barker | 18% |
| Ambika Bhaskaran | 9% |
| Health Group West | 5% |

## EVENTS LEADING TO CHAPTER 11 FILINGS

28.     The wind-down of the Debtor's operations is nearly complete. The Debtor has divested essentially all of its core operating assets and has used the proceeds to extinguish all secured indebtedness. The Debtor's only significant remaining assets are the Cash and the Receivables, and the Debtor's remaining creditors are principally limited to prepetition vendors, former landlords, and other similarly situated unsecured creditors.

29.     In the months leading up to the Petition Date, the Debtor proactively communicated with its trade creditors to explain the events described above and to ask for the trade creditors' cooperation while the Debtor completed the wind down process and liquidated its remaining assets. To that end, the Debtor sent a formal letter to its trade creditors on June 17, 2013 (a copy of which is attached to this Statement as Exhibit A). The letter identified Odyssey Capital Group, LLC's role in assisting the Debtor with its wind-down. The letter also delineated the history of the Debtor, including the Debtor's cash flow issues and eventual sale to Banner. Finally, the letter indicated the Debtor's goal of winding down operations and

distributing remaining assets to creditors while hopefully avoiding a bankruptcy filing, and provided the Debtor's projected number of remaining creditors and anticipated remaining assets available for distribution.

30.     In the ensuing weeks, the Debtor's employees and advisors worked diligently to collect outstanding receivables and to analyze remaining creditors' claims. Once the universe of claims against the Debtor and Cash available to pay such claims became clearer, the Debtor again reached out to trade creditors through a formal letter dated September 9, 2013 to explain the range of anticipated recovery. A copy of this second letter to trade creditors is attached to this Statement as <u>Exhibit B</u>. Consistent with the formal letters, the Debtor made an initial pro rata distribution to creditors, representing roughly 5% of outstanding undisputed claims, and sent out an accompanying letter on September 23, 2013. This third letter to trade creditors is attached to this Statement as <u>Exhibit</u> C.

31.     While many of the trade creditors exhibited patience and understanding in the Debtor's process of winding down and liquidating its remaining assets, several others initiated legal action against the Debtor and took other aggressive steps to the detriment of the Debtor and its creditor body as a whole. Most notably, on September 19, 2013, Medical Solutions, Inc., an unsecured trade creditor of the Debtor, filed a garnishment proceeding against the Debtor in the Pinal County Superior Court. On or around October 1, 2013, Medical Solutions, Inc. served writs of garnishment on, among others, FirstBank, N.A. As a result of these garnishment proceedings, FirstBank segregated and froze $242,832.31 of the Debtor's funds in one of the Debtor's accounts at FirstBank.

32.     The Debtor contacted counsel for Medical Solutions and explained the avoidance action, bankruptcy, and recovery dilution ramifications of Medical Solutions' garnishment actions. Medical Solutions refused, however, to abate its garnishment actions.

33.     Thus, while the Debtor had initially hoped to avoid this chapter 11 filing, garnishment proceedings pursued by Medical Solutions, together with the aggressive actions of several other of the Debtor's creditors, have necessitated the filing of this chapter 11 case to ensure an orderly liquidation and accompanying distribution for the benefit of all creditors.

34.     Through this bankruptcy, the Debtor will complete the orderly wind-down of any remaining assets and operations, address any disputed, contingent, or unliquidated claims, prosecute claims on behalf of the Debtor, and distribute estate assets under a chapter 11 plan. To that end, the Debtor will shortly file and prosecute its chapter 11 plan in this case.

## STATEMENTS IN SUPPORT OF FIRST DAY PLEADINGS

The following statements are submitted in support of the First Day Pleadings and are based upon personal knowledge or knowledge obtained from employees of the Debtor.[9]

**A.      Emergency Motion for an Order: (A) Authorizing the Debtors to Pay or Honor Certain Prepetition Claims for Employee Wages and Benefits; and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests**

35.     The Debtor currently employs just six people (the "**Employees**"). The Employees include the Chief Financial Officer, the Chief Operating Officer, as well as persons responsible for accounting, collections, equipment, information technology, and other areas. Four of the Employees are paid on a salaried basis, and the other two Employees are paid on an hourly "as needed" basis. None of the Employees are union employees and the Debtor is not party to any collective bargaining agreements. In addition, although the Debtor has used independent

---

[9]      Capitalized terms not otherwise defined in this Statement retain the definition ascribed to them in the applicable underlying motion.

contractors in the past, the Debtor is not currently utilizing the services of independent contractors.

36.     The Employees perform a wide variety of critical functions, including regulatory compliance, accounting, finance, payroll, collections, maintenance and processing of patient records, and other tasks related to winding down the Debtor's operations.  The Employees' skill, knowledge and understanding of the Debtor's operations and regulatory issues are essential to the efficient and cost-effective wind-down of the Debtor's business. The Debtor believes it is in the best interest of this estate—both from a time and cost perspective—to have the existing Employees wrap-up the Debtor's existing wind-down process as much as possible.   The alternative—finding qualified replacements or utilizing professionals---would be cost prohibitive.  As part of the continuing wind-down process, employees will continue to roll off of payroll over the next couple of months.  The Debtor anticipates that its employee headcount will be reduced to just one or two by the end of 2013.

37.     Just as the Debtor depends on the Employees to operate, the Employees depend on the Debtor. The Employees rely on the Debtor for their wages and benefits (collectively, the "**Compensation**") from the Debtor to continue to pay their daily living expenses. The Employees will be exposed to significant financial difficulties if the Debtor is not permitted to pay the Employees their full unpaid Compensation.

38.     As set forth more fully below, and based on the timing of the Petition Date, outstanding unpaid obligations related to prepetition employee wages and employee benefit programs will accrue on October 25, 2013. As set forth more fully below, the Debtor seeks authority to pay these obligations in the ordinary course of business.

39.     The Debtor's Employees are paid on a bi-weekly basis. The last payroll run by the Debtor was paid on October 11, 2013 which paid the Employees for salaries through the period ending October 5, 2013. The Debtor's payroll for the Employees for the pay period ending October 5, 2013 totaled approximately $25,000 in gross wages. The next payroll period will end on October 19, 2013, and payroll will be due on October 25, 2013. The Debtor anticipates that, as of the Petition Date, accrued but unpaid wages will total approximately $21,000. Accordingly, the Debtor seeks authority to pay all accrued but unpaid wages in the ordinary course of business.

40.     The Debtor reimburses Employees for certain expenses incurred on behalf of the Debtor in the scope of their employment (the "**Reimbursable Expenses**"). The Reimbursable Expenses generally include cost for any necessary (a) travel (*i.e.*, meals, hotels and rental cars), (b) gas and/or mileage, (c) telephone charges, and (d) professional license fees and continuing education. The Reimbursable Expenses are incurred on the Debtor's behalf and with the understanding that the Debtor will reimburse such expenses. As of the Petition Date, the Debtor estimates that there will be no outstanding unpaid Reimbursable Expenses.

41.     Certain amounts are deducted from the Employees' wages in each pay period for garnishments, child support, and other pre-tax and/or after-tax deductions payable under certain Benefit Programs (as defined below, including insurance premiums and other miscellaneous deductions) (collectively, the "**Deductions**"). The Deductions are forwarded to the appropriate third-party recipients. In the payroll scheduled for October 25, 2013, the Debtor does not anticipate that any Deductions will be made. However, the Debtor seeks authority to pay any accrued Deductions in the ordinary course of business.

42.     In addition, the Debtor is required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, Social Security and Medicare taxes (collectively, the "**Withheld Amounts**"). The Withheld Amounts for the pay period ending October 25, 2013 will total approximately $1,900.

43.     The Debtor contributes additional funds for Social Security and Medicare taxes, based on a percentage of gross payroll and additional amounts for federal and state unemployment insurance (the "**Employer Payroll Taxes**," and together with the Withheld Amounts, the "**Payroll Taxes**"). The Payroll Taxes, including both the Withheld Amounts described above and the Employer Payroll Taxes for the pay period ending October 25, 2013 will total approximately $1,900. The Debtor seeks authority to withhold the Payroll Taxes in the ordinary course of business.

44.     The Debtor utilizes the third-party payroll services company PayCom to pay all Employees' Compensation as described in this Motion. In the ordinary course of business, the Debtor provides PayCom with payroll data and begins funding the payroll account 2-3 days in advance of each payroll date. PayCom is responsible for paying all withholdings to the applicable third parties, including taxing authorities.

45.     As of the Petition Date, the Debtor anticipates that PayCom may need to forward some or all of the Deductions or Payroll Taxes for the pay period ending on October 25, 2013 to the appropriate third-party recipients or taxing authorities.

46.     The Debtor provides certain benefits to eligible Employees and their dependents. These benefits include, but are not limited to, workers' compensation insurance, run-out payments related to certain self-insurance claims, and paid time off (collectively, the "**Benefit Programs**").

47.     The Benefit Programs are described below. The Debtor seeks authority, but not the obligation, to satisfy all of its prepetition obligations related to the Benefit Programs and to remit all withholdings associated with such Benefit Programs.

48.     If the Debtor is not authorized to honor the obligations related to the Benefit Programs, the current or former employees may not be reimbursed or have their benefits claims paid. In addition, certain current or former employees may become primarily obligated for the payment of these claims in cases where health care providers have not been reimbursed and may face termination of health services.

49.     The Debtor ceased providing health insurance, life insurance, dental insurance and vision insurance as of May 31, 2013. The Debtor is still obligated, however, to make premium payments of approximately $22,000 per month to cover Employees' self-insured health policy run-out claims arising prior to May 31, 2013 (the "**Run-Out Payments**"). Accordingly, the Debtor seeks authority to continue such payments in the ordinary course of business.

50.     The Debtor provides workers' compensation benefits to their Employees at the statutorily-required levels (the "**Workers' Compensation Program**"). These benefits are available to Employees through the Debtor's workers' compensation policy with Travelers, which administers and pays the Debtors' workers' compensation claims, subject to the contracted deductible per occurrence. None of the Debtor's Employees are currently receiving benefits under the Workers' Compensation Program.

51.     The Debtor provides paid time off ("**PTO**") to the Employees. The amount of PTO available to a particular Employee and the rate at which such PTO accrues is generally determined by the Employee's position and the length of full-time employment. Payment for unused PTO is made to Employees only upon termination or death.

52.     Under state laws, the Debtor must maintain the Workers' Compensation Program to ensure prompt and efficient payment and/or reimbursement of their Employees. If the Debtor fails to maintain the Workers' Compensation Program, it could be prohibited by state law from operating. Payment of all workers' compensation amounts, therefore, is crucial to the continued operation of the Debtor's business throughout its wind-down and orderly liquidation.

53.     As described above, the Employees rely on their compensation, benefits or reimbursement of their expenses to continue to pay their daily living expenses, and the Employees will be exposed to significant financial difficulties if the Debtor is not permitted to honor obligations for the unpaid compensation and benefits. If the Debtor is unable to honor such obligations, Employee morale and loyalty will be jeopardized at a time when such support is critical and certain Employees are likely to seek alternative employment.

54.     Similarly, if the Debtor is not authorized to honor its continued obligation to make the Run-Out Payments that are relied upon for certain health and medical coverage needs, the affected Employees will not have certain benefits claims paid. The Debtor believes such uncertainty will cause significant anxiety at precisely the time that the Debtor needs its Employees to perform their jobs at peak efficiency.

55.     For all of these reasons, paying employee benefits will benefit the Debtor's estate and its creditors by allowing the Debtor's business operations to continue without interruption. Indeed, the Debtor believes that, without the requested relief, its remaining Employees are very likely to seek alternative employment opportunities. Such a development would hamper the Debtor's ability to successfully wind-down operations of this estate under a chapter 11 plan. The loss of valuable Employees, with the resulting loss of institutional knowledge, would be distracting at this critical time when the Debtor is transitioning to an expedited wind-down under

PHOENIX/654832.5

chapter 11. Accordingly, there can be no doubt that the Debtor must take all reasonable steps to retain its Employees by, among other things, honoring all prepetition wage, benefit and related obligations.

56.     The Employees are integral to the Debtor's remaining business operations. Failure to satisfy obligations with respect to the Employees in the ordinary course of business during the first twenty-one (21) days of this case will jeopardize the loyalty and trust of the Employees. Certain of the Employees may leave and thereby cause serious disruption to the Debtor's business operations during this critical period when the Debtor needs the continued support of its Employees to allow for a successful wind-down.

57.     Moreover, the Debtor's Employees rely on their compensation, benefits and reimbursement of their expenses to continue to pay their daily living expenses, and these Employees will be exposed to significant financial difficulties if the Debtor is not permitted to pay the Employees in the ordinary course of business.

58.     The Debtor represents that it has sufficient availability of funds to pay the amounts described in this Motion by virtue of immediate access to unencumbered cash. Also, under the Debtor's existing cash management system, the Debtor represents that checks or wire transfer requests can be readily identified as relating to an authorized payment with respect to the Benefit Programs. Accordingly, the Debtor believes that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently and that all applicable financial institutions should be authorized, when requested by the Debtor, to receive, process, honor and pay any and all checks or wire transfer requests in respect of the Benefit Programs.

Dated October 17, 2013.                          */s/ Grant Lyon*
                                                    Grant Lyon

Case 4:13-bk-18188-EWH    Doc 4    Filed 10/17/13    Entered 10/17/13 16:05:14    Desc
Main Document    Page 17 of 26

**Exhibit A**

ODYSSEY
CAPITAL
GROUP, LLC

One Renaissance Square
Two North Central Avenue,
Suite 720, Phoenix, AZ 85004

June 14, 2013

Re: Outstanding Payments

To Whom It May Concern:

Apache Junction Hospital, LLC d/b/a Arizona Regional Medical Center ("ARMC"), engaged Odyssey Capital Group, LLC ("Odyssey") as its financial advisor and chief restructuring officer in March 2013 to address what, at the time, were serious cash flow and liquidity issues. These issues related to both its Mesa and Apache Junction hospital locations and resulted from, among other things, the untimely and tragic death of Dr. Robert Siegel in a plane crash in May 2012. Since its engagement, Odyssey has been responsible for establishing and maintaining vendor relationships as well as overseeing ARMC's day-to-day cash management.

As you are aware, ARMC operated two hospitals; one in Mesa and the other in Apache Junction. Due to the severe cash flow issues, the Mesa location stopped accepting patients at the end of April 2013 and the physical assets of the Apache Junction location were sold to Banner Health ("Banner"), which sale closed on May 24, 2013. ARMC currently has no hospital operations and employs less than a dozen people.

At this point, ARMC is finalizing the wind down of its operations with a goal toward distributing cash to its creditors. ARMC appreciates the patience shown by the vendor community throughout this difficult process and ARMC is asking for your continued patience in the wind down process.

The questions that Odyssey most often hears from ARMC's creditors (totaling more than 350) include:

(1) When can creditors expect payment?
(2) How much will creditors be paid?

This letter is meant to provide some insight regarding those questions. In short, the answers depend on the amount of cash collected on outstanding receivables (discussed in further detail below) and the timing of those collections.

ARMC currently has approximately $1.1 million in cash and, ARMC believes, between $2 million and $3 million in outstanding accounts receivable. Some of the existing cash will be spent on (i) the collection of outstanding receivables, (ii) the payment of wages to a few remaining employees, and (iii) the completion of a regulated wind down process (which includes payments to professionals assisting AJH in that process). None of this cash is

tel: 502-257-8450    email: info@odyCap.com    web: www.odyCap.com

currently being utilized to make payments on past due balances to vendors or other creditors of ARMC; nor is it anticipated that such payments will be made until we have a better understanding of the amount available for distribution.

Although Banner acquired the physical assets of ARMC's Apache Junction location, it did not acquire ARMC's receivables (which, as stated above, could result in between $2 million and $3 million in additional proceeds). The collection of the receivables will be another source of payment to ARMC's creditors. Odyssey does not know how much of the receivables are collectable but some of ARMC's billing and collections staff has been retained to complete the collections effort.

Several creditors have asked whether ARMC intends to file bankruptcy. ARMC, its Executive Committee, and its advisors (including Odyssey) would prefer to conduct an orderly wind down process without the need to file bankruptcy because it can be a costly endeavor. However, that decision will depend on the behavior of ARMC's creditors. ARMC will not risk the recovery of the majority of creditors in order to appease a vocal or aggressive minority. ARMC will also not attempt to appease a large creditor at the expense of smaller vendors. If ARMC is unable to guarantee that all creditors are treated equitably and fairly, it may be forced to file bankruptcy to protect wind down process.

It should be noted that ARMC has given Odyssey check-writing authority. Odyssey does not anticipate making payments on outstanding balances to vendors or other creditors of ARMC until the collections effort is near completion. Also, no distributions will be made for the equity of ARMC.

You will be provided with periodic updates in the collection and wind down process. ARMC and Odyssey appreciate your patience. Should you have additional questions, please contact me, Matt Foster (602.257.8400 x115), or Dane Nielsen (602.257.8400 x157) at Odyssey.

Regards,

Grant Lyon
Managing Director
Odyssey Capital Group, LLC


cc: Executive Committee, Apache Junction hospitals LLC

**Exhibit B**

Case 4:13-bk-18188-EWH    Doc 4    Filed 10/17/13    Entered 10/17/13 16:05:14    Desc
Main Document      Page 21 of 26



ODYSSEY
CAPITAL
GROUP, LLC

One Renaissance Square
Two North Central Avenue,
Suite 720, Phoenix, AZ 85004

September 9, 2013

Re: September Distribution

To Whom It May Concern:

As discussed in the letter dated June 14, 2013 (the "June Letter"), Apache Junction Hospital, LLC d/b/a Arizona Regional Medical Center ("ARMC"), engaged Odyssey Capital Group, LLC ("Odyssey") as its financial advisor and chief restructuring officer in March 2013 to address what, at the time, were serious cash flow and liquidity issues. Due to those issues, the Mesa location stopped accepting patients at the end of April 2013 and the physical assets of the Apache Junction location were sold to Banner Health ("Banner"), which sale closed on May 24, 2013.

Since the June Letter:

- The ARMC staff has been reduced to three employees;
- The remaining ARMC employees have focused on (i) cost reports and other tasks that directly impact collections from Medicare, (ii) collections efforts on non-Medicare receivables, and (iii) regulated wind down tasks such as the storage of medical records;
- Odyssey, along with ARMC's legal counsel Squire Sanders (US) LLP ("Squire Sanders"), has been responsible for maintaining an open dialogue with vendors and has continued to monitor ARMC's limited cash outflows; and
- The members of ARMC have voted to wind down and dissolve ARMC using the most efficient means available.

The remaining ARMC employees, Odyssey, and Squire Sanders are diligently working to maximize the recovery for ARMC's creditors. The purpose of this letter is to provide insight for the creditors regarding the amount and timing of their recovery. Both of those factors will be determined by (i) the collection of outstanding receivables and (ii) the total amount owed to creditors.

Following an anticipated payment from Medicare, the majority of collections will be complete. That said, there are two substantial outstanding receivables that may require legal action to collect ("Receivables"). ARMC is currently determining whether to expend the costs to collect on those two balances as they would directly impact the creditors' recovery.

tel: 302-257-8450      email: info@odyCap.com      web: NewOdyCap.com

Unfortunately, the total amount owed to ARMC creditors has not yet been finalized. This is due to an unquantified obligation on a terminated lease ("Lease Obligation") which, as discussed below, materially impacts the total recovery for the other ARMC creditors. ARMC is holding discussions with the former lessor to determine the appropriate amount owed on the lease and, once that is finalized, will be able to quantify the total amount owed to all ARMC creditors.

As there are still several variables impacting creditor recovery, ARMC has calculated "Worst Case" and "Best Case" scenarios, which are outlined below.

- Worst Case – 2% recovery for ARMC creditors due to:
  - No amount collected on Receivables and
  - Lease Obligation is six times the amount under the Best Case.

- Best Case – 12% recovery for ARMC creditors due to:
  - Receivables are collected in full and
  - Lease Obligation is settled at an amount that ARMC believes is fair and equitable.

Rather than wait until the outstanding issues are resolved, ARMC is going to make an initial distribution of $500,000 on September 16, 2013 (the "Initial Distribution"). Each creditor will receive its pro rata portion of the Initial Distribution, with creditors holding disputed claim amounts being held in reserve. The Initial Distribution will not impact ARMC's ability to prosecute both the Lease Obligation and the Receivables. Any use of the remaining cash will be utilized to increase the creditors' recovery.

It should be noted that the members of ARMC have voted to allow the Executive Committee to file bankruptcy. The Executive Committee's decision to file bankruptcy will largely be based on the actions of the creditors. ARMC is attempting to complete the wind down process outside of bankruptcy so as to avoid the inherent costs associated with a filing. However, if ARMC is battling lawsuits from each of its vendors (over 300), the Executive Committee will decide to file bankruptcy in order to mitigate legal costs and maximize the return to all creditors.

We appreciate your patience during this difficult process and assure you that ARMC is doing everything in its power to return as much as possible to the creditors that allowed it to serve the communities of Mesa and Apache Junction. Should you have additional questions, please contact me (602.432.7971), Matt Foster (602.257.8400 x115), or Dane Nielsen (602.257.8400 x157) at Odyssey.

Regards,

Grant Lyon
Managing Director
Odyssey Capital Group, LLC


cc: Executive Committee, Apache Junction Hospitals LLC

**Exhibit C**



One Renaissance Square
Two North Central Avenue,
Suite 720, Phoenix, AZ 85004

September 23, 2013

Re: September Distribution

To Whom It May Concern:

Apache Junction Hospital, LLC d/b/a Arizona Regional Medical Center ("ARMC") has made a distribution ("September Distribution") as discussed in the letter dated September 9, 2013 (the "September Letter"). The September Distribution represents approximately a 5% recovery for ARMC creditors, well above the "Worst Case" scenario of 2% outlined in the September Letter. This is due to good collections and the mitigation of certain wind down costs. The few remaining employees continue to manage the collection of accounts receivable and, under the direction of the Executive Committee, are implementing the wind down plan.

The check included with this letter represents your pro rata share of the September Distribution. ARMC anticipates making a second distribution to creditors in December 2013. The amount of December distribution will be contingent on the progress of the wind down plan, the ability to pursue two substantial outstanding receivables, and the resolution of disputed obligations. At this time, ARMC is holding cash distributions for disputed obligations in reserve.

We appreciate your patience during this difficult process and assure you that ARMC is doing everything in its power to return as much as possible to the creditors that allowed it to serve the communities of Mesa and Apache Junction. Should you have additional questions, please contact me (602.432.7971), Matt Foster (602.257.8400 x115), or Dane Nielsen (602.257.8400 x157) at Odyssey.

Regards,

Grant Lyon
Managing Director
Odyssey Capital Group, LLC

cc: Executive Committee, Apache Junction Hospitals LLC