Thomas J. Salerno (AZ Bar No. 007492)
thomas.salerno@squiresanders.com
Bradley A. Cosman (AZ Bar No. 026223)
bradley.cosman@squiresanders.com
K. Derek Judd (AZ Bar No. 028565)
derek.judd@squiresanders.com
**SQUIRE SANDERS (US) LLP**
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
(602) 528-4000
Counsel to Debtor-In-Possession

Rafael X. Zahralddin-Aravena (*pro hac vice*)
rxza@elliottgreenleaf.com
Jonathan M. Stemerman (*pro hac vice*)
jms@elliottgreenleaf.com
**ELLIOTT GREENLEAF**
1105 N. Market Street, Ste. 1700
Wilmington, DE 19801
(302) 384-9400
Counsel to the Official Committee of
Unsecured Creditors

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>APACHE JUNCTION HOSPITAL, LLC,<br><br>Debtor. | Chapter 11<br>Case No. 4:13-bk-18188-EWH<br><br><br>**DISCLOSURE STATEMENT**<br>**IN SUPPORT OF**<br>**AMENDED JOINT PLAN** |

Dated: November 18, 2013

# TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY ................................................................................ 1

    A.    Overview ................................................................................................................ 1
    B.    Notice to Holders of Claims and Equity Interests ................................................. 1
    C.    Summary Of Treatment Of Claims And Equity Interests Under The Plan ........... 2

        Sierra Equities Claims ............................................................................................ 3
        De Lage Landen Claims .......................................................................................... 3
        Equity Interests ....................................................................................................... 3

    D.    Voting Procedures, Ballots, and Voting Deadline ................................................. 3
    E.    Confirmation Procedures ....................................................................................... 4

II.   BACKGROUND REGARDING THE DEBTOR ........................................................... 5

    A.    Overview and History ............................................................................................ 5
    B.    Prepetition Asset Sale and Wind-Down ................................................................ 7
    C.    Prepetition Capital Structure ................................................................................. 9
    D.    Events Precipitating the Chapter 11 Case .............................................................. 9

III.  SIGNIFICANT EVENTS IN CHAPTER 11 CASE .................................................... 10

    A.    Automatic Stay; Administrative Status ................................................................ 10
    B.    "First Day" and Administrative Orders ............................................................... 10

IV.   DESCRIPTION OF THE PLAN ................................................................................... 11

    A.    Introduction .......................................................................................................... 11
    B.    Summary of Claims Process, Bar Date, and Professional Fees ........................... 12
    C.    Classification and Treatment of Claims and Equity Interests, Generally ........... 12
    D.    Treatment of Unclassified Claims ....................................................................... 13

        1.    Allowed Administrative Claims .............................................................. 13
        2.    Priority Tax Claims .................................................................................. 13
        3.    Professional Fees ..................................................................................... 13
        4.    Treatment ................................................................................................. 13

    E.    Treatment of Classified Claims and Interests ..................................................... 14

        1.    Class 1 (Priority Claims) ......................................................................... 14
        2.    Class 2 (General Unsecured Claims) ....................................................... 15
        3.    Class 3 (Sierra Equities Claims) ............................................................. 15
        4.    Class 4 (De Lage Landen Claims) ........................................................... 15
        5.    Class 5 (Equity Interests) ........................................................................ 15

V.    IMPLEMENTATION OF THE PLAN ......................................................................... 16

    A.    Effective Date Funding ........................................................................................ 16
    B.    Liquidation Trust ................................................................................................. 16

        1.    The Liquidation Trustee ........................................................................... 16
        2.    Purposes ................................................................................................... 17

        3.      Disputed Claims ....................................................................... 17

        4.      Section 1145 Exemption .......................................................... 18

VI.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................... 18

    A.     Rejection of Contracts and Leases ................................................ 18
    B.     Rejection Damages Bar Date ....................................................... 18
    C.     Indemnification Obligations ........................................................ 18
    D.     Benefit Plans .............................................................................. 19

VII.   DESCRIPTION OF OTHER PROVISIONS OF THE PLAN ................... 19

    A.     Vesting of Assets ........................................................................ 19
    B.     Injunction .................................................................................. 19
    C.     Exculpation ................................................................................ 20
    D.     Avoidance Actions and Litigation Claims .................................... 20
    E.     Retention of Jurisdiction After the Effective Date ........................ 20

VIII.  ACCEPTANCE AND CONFIRMATION OF THE PLAN ....................... 22

    A.     Acceptance of the Plan ............................................................... 22
    B.     Feasibility of the Plan ................................................................. 22
    C.     Best Interests Test ...................................................................... 23

        1.      Explanation ............................................................... 23
        2.      Application of the Liquidation Analysis ..................... 24

IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............... 24

    A.     Introduction ............................................................................... 24
    B.     United States Federal Income Tax Consequences to the Debtor ......... 25
    C.     Federal Income Tax Consequences to Creditors ......................... 25

        1.      Generally ................................................................... 25
        2.      Accrued Interest ........................................................ 28
        3.      Market Discount ........................................................ 28
        4.      Original Issue Discount .............................................. 28
        5.      Other Claimholders .................................................... 29
        6.      Information Reporting and Backup Withholding ........ 29

    D.     Importance of Obtaining Professional Tax Assistance ................. 29

X.     RISK FACTORS ................................................................................ 30

    A.     Generally ................................................................................... 30
    B.     Risk of Non-Confirmation of the Plan ........................................ 30

XI.    ALTERNATIVES TO THE PLAN ...................................................... 30

    A.     Continuation of the Chapter 11 Case ........................................... 31
    B.     Alternative Plans of Reorganization ........................................... 31
    C.     Liquidation Under Chapter 7 ...................................................... 31

XII.   CONCLUSION .................................................................................. 31

    A.     Hearing on and Objections to Confirmation ................................ 31

        1.      Confirmation Hearing ........................................................................... 31

        2.      Deadline for Objections to Confirmation ................................................. 31

    B.      Recommendation ................................................................................... 32

APPENDICES TO DISCLOSURE STATEMENT

Appendix 1 – Plan

Appendix 2 – Order Approving Disclosure Statement

Appendix 3 – CV of John P. Madden

Appendix 4 – Selected Financial Information

Appendix 5 – Liquidation Analysis

# I. INTRODUCTION AND SUMMARY

## A. Overview

Apache Junction Hospital, LLC (the "*Debtor*") filed its voluntary Chapter 11 bankruptcy petition under Title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Arizona (the "*Bankruptcy Court*") on October 17, 2013 (the "*Petition Date*").

The Bankruptcy Court has approved this disclosure statement (the "*Disclosure Statement*") under Bankruptcy Code § 1125 in connection with confirmation of the Amended Joint Plan (the "*Plan*") proposed by the Debtor and the Official Committee of Unsecured Creditors (the "*Committee*") in this case (the "*Chapter 11 Case*"). The Plan was filed with the Bankruptcy Court on November 15, 2013.

The following introduction and summary is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements appearing elsewhere in this Disclosure Statement and the Plan. All capitalized terms not defined in this Disclosure Statement have the meanings given to them in the Plan. A copy of the Plan, separately filed in the Chapter 11 Case, is **<u>Appendix 1</u>** to this Disclosure Statement.

This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, the circumstances giving rise to this Chapter 11 Case, significant events that have occurred during the Chapter 11 Case, and the anticipated liquidation of the Debtor under the Plan. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and how voting on the Plan will occur. Certain provisions of the Plan, and the descriptions and summaries contained in this Disclosure Statement, may be the subject of continuing negotiations among the Debtor, the Committee, and various parties, may not have been finally agreed on, and may be modified. Those modifications, however, will not have a material effect on the distributions contemplated by the Plan.

The Debtor and the Committee are the co-proponents of the Plan within the meaning of Bankruptcy Code § 1129. The Plan contains separate Classes and proposes recoveries for holders of Claims against and Equity Interests in the Debtor. After careful review of the Debtor's current financial condition and the needs associated with the liquidation of the Debtor's assets, the Debtor and the Committee have concluded that the recovery to Creditors will be maximized by the structured liquidation of the Debtor as contemplated by the Plan.

## B. Notice to Holders of Claims and Equity Interests

This Disclosure Statement is being used to solicit votes on the Plan only from holders of impaired Claims, and is being transmitted to Creditors with unimpaired Claims and to Equity Holders and other parties in interest for informational purposes. The purpose of this Disclosure

Statement is to provide adequate information to enable the holder of an impaired Claim to make a reasonably informed decision with respect to the Plan before voting to accept or reject the Plan.

The Bankruptcy Court entered an order, attached as **Appendix 2** to this Disclosure Statement, approving this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable Creditors to vote on the Plan as required by Bankruptcy Code § 1125. **The Bankruptcy Court's approval of this Disclosure Statement does not constitute either a guaranty of the accuracy or completeness of the information contained in this Disclosure Statement or the Bankruptcy Court's endorsement of the Plan.**

Holders of Claims are encouraged to read this Disclosure Statement and its appendices carefully and completely before deciding to accept or reject the Plan. If a description in this Disclosure Statement and a term of the Plan conflict, the Plan governs.

This Disclosure Statement and the other materials included in the solicitation package are the only documents authorized by the Bankruptcy Court to be used in connection with the solicitation of votes on the Plan. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtor or the Plan other than the information contained in this Disclosure Statement.

Certain of the information contained in this Disclosure Statement is by its nature forward-looking and contains estimates, assumptions and projections that may be materially different from actual or future results. Except as otherwise specifically stated, this Disclosure Statement does not reflect any events that may occur after the date of this Disclosure Statement and that may have a material effect on the information contained in this Disclosure Statement. The Debtor and Committee do not intend to update the information contained in this Disclosure Statement.

The financial information contained in this Disclosure Statement has not been audited by a certified public accountant and may not have been prepared in accordance with generally accepted accounting principles.

This Disclosure Statement has been prepared in accordance and compliance with Bankruptcy Code § 1125 and Bankruptcy Rule 3016(b) and not necessarily in accordance with federal or state securities laws or other non-bankruptcy law. This Disclosure Statement has been neither approved nor disapproved by the Securities and Exchange Commission (the "*SEC*"), nor has the SEC passed on the accuracy or adequacy of the statements contained in this Disclosure Statement.

This Disclosure Statement may not be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan on holders of Claims against, or Equity Interests in, the Debtor.

## C.    Summary Of Treatment Of Claims And Equity Interests Under The Plan

The Plan contains definitions and rules of interpretation and provides the treatment of separate classes for holders of Claims against, and Equity Interests in, the Debtor. As provided

2

by Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims are not classified.

The table below summarizes the classification and treatment of the prepetition Claims and Equity Interests under the Plan. The classification and treatment for all Classes are described in more detail in Section IV of this Disclosure Statement and Articles 2 and 3 of the Plan.

| Class | Description | Plan Treatment |
|-------|-------------|----------------|
| 1 | Priority Claims<br><br>**(Unimpaired; deemed to accept)** | Each holder of an Allowed Priority Claim other than a Priority Tax Claim will receive Cash in an amount equal to its Allowed Priority Claim on the later of: (i) the Effective Date, or as soon after that date as feasible; and (ii) 30 days after the Priority Claim is Allowed; unless, before the later of those two dates, the holder of the Claim and the Liquidation Trust agree in writing to a different date. |
| 2 | General Unsecured Claims<br><br>**(Impaired; entitled to vote)** | Each holder of an Allowed Class 2 Claim will receive, in full and final satisfaction of its Allowed Class 2 Claim, a Pro Rata beneficial interest in the Liquidation Trust. |
| 3 | Sierra Equities Claims<br><br>**(Impaired; entitled to vote)** | Each holder of an Allowed Class 3 Claim receives, in full and final satisfaction of its Allowed Class 3 Claim, a Pro Rata beneficial interest in the Liquidation Trust. |
| 4 | De Lage Landen Claims<br><br>**(Impaired; entitled to vote)** | Each holder of an Allowed Class 4 Claim receives, in full and final satisfaction of its Allowed Class 4 Claim, a Pro Rata beneficial interest in the Liquidation Trust. |
| 5 | Equity Interests<br><br>**(Impaired; deemed to reject)** | The holders of Equity Interests and subordinated Claims will not receive or retain any rights, property, or distributions on account of their Equity Interests or Claims under the Plan. |

## D. Voting Procedures, Ballots, and Voting Deadline

Accompanying this Disclosure Statement are, among other things, copies of: (1) the Plan (**Appendix 1** and separately filed in this Chapter 11 Case); (2) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time, and place of the hearing to consider confirmation of the Plan, and the time for filing objections to the confirmation of the Plan (the "*Confirmation Hearing Notice*"); and (3) if you are entitled to vote, a Ballot (and return envelope along with detailed instructions accompanying the Ballot) to be used in voting to accept or reject the Plan.

3

After carefully reviewing the Plan, this Disclosure Statement, and (if you are entitled to vote) the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by completing the Ballot. You must provide all the information requested on the Ballot; failure to do so may result in your vote being disqualified. For your vote to be counted, your Ballot must be properly completed and **ACTUALLY RECEIVED** no later than [_____], 2013, at 5:00 p.m. Arizona Time (the "*Voting Deadline*") by counsel for the Debtor, whose address and contact information is on the Ballot.

**Ballots should NOT be sent to the Debtor, the Bankruptcy Court, the U.S. Trustee, or any other party other than the Debtor's Counsel. Ballots not received by the Voting Deadline by the Debtor's counsel will not be counted.**

If: (1) you have any questions about the procedure for voting or the packet of materials that you have received; or (2) you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to either of those documents, please contact: Karen Graves; Squire Sanders (US) LLP; 1 E. Washington St., Suite 2700; Phoenix, AZ 85004; Telephone: (602) 528-4000; e-mail: karen.graves@squiresanders.com.

**E.     Confirmation Procedures**

Under Bankruptcy Code § 1126(f), if a class of claims or interests is unimpaired under a plan, that class (and each member of that class) is conclusively presumed to have voted in favor of the plan and is not solicited to vote on the plan. In this Chapter 11 Case, the Plan contains four Classes of Creditors and one Class of Equity Interests. All Unclassified Claims and Claims in Class 1 are unimpaired by the Plan and holders of such Claims are presumed to have voted in favor of the Plan and will not be solicited to vote on the Plan. All Claims in Classes 2, 3 and 4 are impaired and holders of such Claims are entitled to vote to accept or reject the Plan. Class 5 under the Plan (Equity Interests) is impaired under the Plan; members of that Class will neither receive nor retain any property on account of their Equity Interests. Accordingly, Class 5 is deemed to reject the Plan and its members will not be solicited to vote on the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing to begin on [_____], 2013 at [__]:00 a.m. (Arizona time) before the Honorable Eileen W. Hollowell, United States Bankruptcy Judge, at the United States Bankruptcy Court, 203 North 1st Avenue, Phoenix, Arizona 85003. The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for an announcement of the adjournment date made at the Confirmation Hearing. The Bankruptcy Court has ordered that any objections to confirmation of the Plan be filed with the Clerk of the Bankruptcy Court and served so that they are actually received on or before [_____], 2013, at [__]:00 p.m. (Arizona time) by counsel for the Debtor, counsel to the Committee, and the Office of the United States Trustee.

**THE DEBTOR AND THE COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AND STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

---

4

## II. BACKGROUND REGARDING THE DEBTOR

### A. Overview and History

The Debtor is an Arizona limited liability company that formerly operated two hospital facilities, one in Pinal County, Arizona, and the other in Maricopa County, Arizona. In 2008, the Debtor re-opened a hospital in Mesa, Arizona formerly operated as Mesa General Hospital. The Debtor operated at the Mesa location under a nonresidential real property lease (the "*Mesa Lease*") with Sierra Equities, Inc. ("*Sierra Equities*") as lessor. The Mesa location was a full service hospital with 80 beds and as many as 300 employees. The Debtor also opened another full service hospital in Apache Junction, Arizona. The Debtor operated the Apache location under a nonresidential real property lease (the "*Apache Lease*") with Gracus Realty, LLC ("*Gracus Realty*") as lessor. The Apache location contained 30 hospital beds and up to 150 employees. The Debtor also utilized the Apache location to operate catheterization laboratories and provide other related services. At both the Mesa location and the Apache location, the Debtor operated under various equipment leases with Gracus Leasing, LLC ("*Gracus Leasing*") as lessor.[1]

Going back to at least 2010, the Debtor began experiencing financial distress and liquidity problems. In order to finance operations, the Debtor continued to grow and stretch its accounts payable obligations. The tragic and unexpected death of Dr. Robert Siegel, M.D. in May 2012—a renowned cardiologist and entrepreneur and owner/manager of the Debtor—exacerbated the Debtor's financial distress. The Debtor's quarterly gross revenue decreased from a peak of $65.9 million in Q1 2012 to $44.7 million in Q2 2012 and $37.9 million in Q3 2012. Annual gross revenue decreased from $209.8 million in 2011 to $192 million in 2012, a 9% decrease. Gross revenue from June 2012, the month after Dr. Bob Siegel's death, through December 2012 totaled $95.9 million; a 16.7% decrease over the same period in 2011.

The Debtor's liquidity problems magnified when the Debtor's sublessee—Promise Hospital of Phoenix, Inc.—began defaulting on lease and service contract payment obligations. The Debtor had subleased part of the Mesa location to Promise Hospital back in November of 2010. Under the sublease with Promise Hospital, the Debtor received an additional cash flow in the form of rent of approximately $78,000 per month. In addition, Promise Hospital and the Debtor were party a service agreement. Under the service agreement, Promise Hospital reimbursed the Debtor for various supplies at a rate of approximately $20,000 per week. By the summer of 2012, Promise Hospital had defaulted on its payment obligations under the sublease and the service contract. The payment defaults by Promise Hospital had negative material impact on the Debtor's liquidity and intensified the Debtor's financial distress.

Changes in insurance coverage programs and patient mix also negatively impacted the Debtor's financial performance by negatively affecting *net revenue* (a hospital's gross revenue is reduced to "net revenue" by (1) adjustments and discounts mandated by insurance, Medicare,

---

[1] Gracus Realty and Gracus Leasing are affiliates of the Debtor. Gracus Realty and Gracus Leasing are entities wholly-owned by Barbara Barker (Siegel), M.D., who is the Debtor's majority interest holder and the former spouse of Dr. Robert Siegel, M.D.

5

Medicaid, or AHCCCS, as well as (2) bad debts and charity care). In 2011, revenue reductions totaled $163.1 million, representing 77.7% of gross revenue. In 2012, revenue reductions totaled $156.2 million, representing 81.3% of gross revenue. Said another way, the Debtor's net revenue was decreasing at the same time that the Debtor's gross revenue was decreasing, meaning the Debtor was able to successfully collect fewer of the dollars it billed.

Changes to Arizona Health Care Cost Containment System (a.k.a "*AHCCCS*," pronounced access) Health Insurance, and changes in the Debtor's patient mix exacerbated the Debtor's financial problems. In 2012, the Medicaid/AHCCCS enrollment criteria changed to remove most childless adults from coverage. The result was that a large percentage of AJH's patients that were previously covered by AHCCCS no longer had coverage. Those patients would still come to AJH for treatment, however. At the same time, following the tragic death of Mr. Siegel, the number of profitable cardiac patients serviced by the Debtor decreased. The decrease in such profitable patients increased the financial burden associated with servicing the Debtor's remaining customer mix.

By October of 2012, the Debtor's financial condition had deteriorated to such a dramatic extent that the Debtor was facing the imminent possibility of missing payroll and other key operating costs. The Debtor's needed bridge financing to meet payroll obligations and finance operations until the Debtor's significant receivables were collected. In response, the Debtor (1) obtained approximately $425,000 in loans from its largest member Barbara Siegel; and (2) obtained short-term financing in November 2012 from Marrick Business Finance, LLC ("*Marrick*"). With respect to the Marrick financing, the Debtor obtained a $3,000,000 loan (the "*Marrick Loan*") to cover operating costs. The Debtor was required to repay the Marrick Loan in full, with a 25% factoring fee, in nine months.

The Marrick Loan provided the Debtor with liquidity to pay employees and vendors through a relatively busy December 2012 through February 2013. Unfortunately, the Mesa location's average occupancy began decreasing, eventually reaching less than 10%, with only half of those patients paying their resulting hospital bills. The Apache location experienced a similar decrease in occupancy. By late 2012 the Debtor had accrued unpaid payroll tax liabilities of approximately $1 million (the "*Tax Payable*").

In early 2013, liquidity shortages forced the Debtor to cease making payments under the Marrick Loan. In response, Marrick exercised its rights under the Marrick Loan to have all receivables sent directly to Marrick. Of course, this exasperated the Debtor's liquidity shortage. Marrick's interception of receivable collections left the Debtor without the cash receipts necessary to pay outstanding trade payables, which at the time totaled several million dollars. Based on the Debtor's failure to pay amounts outstanding, several of the Debtor's most critical vendors threatened to cut off further supply of goods and services to the Debtor. The goods and services provided by these vendors were vital to the Debtor's ability to continue operating and providing essential healthcare services. Accordingly, the Debtor focused its attention on negotiating continued provision of goods and services from such critical vendors.

Many of the Debtor's vendors were supportive of the Debtor's efforts. Notwithstanding, it became readily apparent that projected cash flows for both the Debtor's locations would be

6

insufficient to cover current operating costs, let alone repay the past due obligations to trade creditors or the approximately $2,700,000 owed under the Marrick Loan.

In addition to the outstanding liabilities to trade creditors and the outstanding balance under the Marrick Loan, the Debtor had fallen behind and was in continuing monetary default under both the Mesa Lease and the Apache Lease. Consequently, in April 2013, Sierra Equities filed an action in the Maricopa County Superior Court for appointment of a receiver over the Mesa location. On April 11, 2013, the superior court entered an order appointing Sierra Consulting Group, LLC[2] as receiver (the "*Receiver*").

Following appointment of the Receiver, the Debtor had continued servicing patients from the Mesa location for a period of time at the Apache location. Various pieces of the Debtor's medical and related equipment, however, remained at the Mesa location (the "*Mesa Equipment*"). On September 26, 2013, the court approved an agreement between the Receiver and Florence Medical Alliance, LLC ("*FMA*") for the sale of some of the Mesa Equipment (the "*Equipment Sale Agreement*").[3] The agreed purchase price for the select pieces of Mesa Equipment was $275,000. Pursuant to the Equipment Sale Agreement, FMA paid the Receiver $100,000 in cash and executed a promissory note in favor of the Receiver in the original principal amount of $175,000 and due in full by, at the latest, November 30, 2013 (collectively, the "*Equipment Sale Proceeds*"). The Equipment Sale Proceeds are being held by the Receiver and are property of the Debtor's bankruptcy estate.[4]

As of the Petition Date, the Debtor is no longer operating any health care facilities at the Mesa location, the Apache location, or elsewhere. The Debtor currently has just six employees, all of which are assisting the Debtor in collecting outstanding accounts receivable, processing claims, and otherwise assisting the Debtor in its wind-down process.

## B.    Prepetition Asset Sale and Wind-Down

In light of the pressures on the Debtor's business, and after extensive consultation amongst the Debtor's directors, officers, and financial advisors, the Debtor determined to market the Debtor's remaining business (essentially the Apache location) for sale. To this end, the Debtor retained Bruce Kelley of First Southwest to market the Debtor's business to strategic buyers.

Mr. Kelley, in consultation with the Debtor, contacted a number of entities to gauge interest in the acquisition. Despite extensive marketing efforts, no one expressed an interest in the Mesa location. Both IASIS Healthcare, LLC ("*IASIS*") and Banner Health ("*Banner*") did

---

[2]    Sierra Consulting Group is unrelated to Sierra Equities.

[3]    The Receiver continues to hold the balance of Mesa Equipment not subject to the Equipment Sale Agreement.

[4]    Sierra Equities asserted a landlord's lien on the Mesa Equipment and, upon information and belief, may assert an interest in the Equipment Sale Proceeds. The Debtor reserves all rights to object to or otherwise challenge the landlord's lien asserted by Sierra Equities, including, but not limited to, through the filing of an avoidance action.

7

express interest, however, in acquiring the Apache location. This interest stemmed, in part, from the fact that both IASIS and Banner own nearby facilities and, consequently, would not be required to assume the Debtor's Medicare provider number in order to operate at the Apache location.

The Debtor entered into non-disclosure agreements with IASIS and Banner, and provided financial and operating information to IASIS and Banner pursuant to these agreements. The Debtor offered an exclusive arrangement to either IASIS or Banner on the condition that IASIS or Banner provide an immediate working capital loan to the Debtor.

Despite showing strong initial interest, IASIS ultimately declined to pursue a transaction. Banner, however, made an offer to the Debtor to provide a working capital loan for the Debtor and to purchase the Apache location from the Debtor for approximately $7,600,000. After extensive arm's-length negotiations, this offer was raised to $10,000,000.

Banner provided the Debtor a working capital loan through the *Loan Purchase Agreement* (the "*Loan Agreement*") entered into between Banner and Marrick on April 24, 2013. As provided in the Loan Agreement, Banner satisfied in full the $2,700,000 owed by the Debtor to Marrick and provided $1,500,000 to the Debtor. In separate but interrelated transactions, the Debtor executed two promissory notes in favor of Banner, one in the approximate amount of $2,700,000, and another in the approximate amount of $1,500,000 (collectively, the "*Notes*").

In connection with the Loan Agreement and the Notes, the Debtor, Gracus Realty, Gracus Leasing and Banner also entered into a series of asset purchase and sale agreements for the purchase of the Apache location and related assets, each dated May 23, 2013 (collectively, the "*Sale Agreements*"). The total purchase price for the Apache location and related assets under the Sale Agreements was $10,000,000. Of the $10,000,000 purchase price: (i) approximately $4,200,000 was used to satisfy the Debtor's Notes in full; (ii) approximately $455,000 was used to satisfy the then-remaining outstanding amount of the Tax Payable; (iii) approximately $200,000 was used to satisfy the broker fee owed to Mr. Kelley; (iv) approximately $4,200,000 went to Gracus Realty for sale of the real property and related improvements that were owned by Gracus Realty; (v) approximately $200,000 went to Gracus Leasing for certain medical equipment at the Apache location; (vi) approximately $175,000 went to former employees of the Debtor to satisfy their then-remaining outstanding claims for paid time off; and (vii) the remaining $500,000 went to the Debtor.

Through the Loan Agreement and the Sale Agreements, all of the interests of the Debtor and Gracus Leasing in the Apache location, including the real property, the building on the real property, and all physical assets contained at the Apache location, were transferred to Banner. Moreover, the Loan Agreement and the Sale Agreements allowed the Debtor to extinguish the Debtor's obligations under the Marrick Loan and the Tax Payable, while further adding approximately $500,000 of cash on hand. In addition, under the Sale Agreements the Debtor retained its interest in all outstanding accounts receivable that the Debtor had generated at the Apache location.

Following closing of the Loan Agreement and Sale Agreements, and as of the Petition Date, the Debtor's assets primarily comprised: (1) approximately $1,100,000 in cash (the

8

"*Cash*"); (2) a small amount of remaining patient receivables for the Mesa location and the Apache location (the "*Receivables*");[5] (3) the Equipment Sale Proceeds, which, as set forth above, total $100,000 in cash and the balance owing under a promissory note in the original principal amount of $175,000; and (4) miscellaneous claims with a combined estimated value range between approximately $50,000 and $1,000,000.

## C.    Prepetition Capital Structure

25.    The Debtor does not have any secured creditors. Under the Loan Agreement and the Sale Agreements, all of the Debtor's secured indebtedness was satisfied in full. The Debtor's remaining creditors are principally limited to prepetition vendors, former landlords, and other similarly situated unsecured creditors.

The Debtor's equity ownership structure, which includes all entities owning 5% or more of each class of equity in the Debtor, is as follows:

| Shareholder | Percentage of Shares |
|---|---|
| **Class A Shares** | |
| Barbara Barker (Siegel) and estate of Robert Siegel | 100% |
| **Class B Shares** | |
| Ross McArthur | 33% |
| Barbara Barker (Siegel) and estate of Robert Siegel | 18% |
| Ambika Bhaskaran | 9% |
| Health Group West | 5% |

## D.    Events Precipitating the Chapter 11 Case

The wind-down of the Debtor's operations is nearly complete. The Debtor has divested essentially all of its core operating assets and has used the proceeds to extinguish all secured indebtedness. The Debtor's only significant remaining assets are the Cash and the Receivables, and the Debtor's remaining creditors are principally limited to prepetition vendors, former landlords, and other similarly situated unsecured creditors.

In the months leading up to the Petition Date, the Debtor proactively communicated with its trade creditors to explain the events described above and to ask for the trade creditors' cooperation while the Debtor completed the wind down process and liquidated its remaining

---

5    The Debtor utilizes the services of Delivery Financial Services, LLC, a medical account receivable management company, to assist in the collection of the Receivables.

9

assets. To that end, the Debtor sent a formal letter to its trade creditors on June 17, 2013 (a copy of which is attached as Exhibit A to the Omnibus Statement of Facts and Declaration of G. Grant Lyon in Support of First Day Pleadings [D.E. 4] (the "*Lyon Declaration*")). The letter identified Odyssey Capital Group, LLC's role in assisting the Debtor with its wind-down. The letter also delineated the history of the Debtor, including the Debtor's cash flow issues and eventual sale to Banner. Finally, the letter indicated the Debtor's goal of winding down operations and distributing remaining assets to creditors while hopefully avoiding a bankruptcy filing, and provided the Debtor's projected number of remaining creditors and anticipated remaining assets available for distribution.

In the ensuing weeks, the Debtor's employees and advisors worked diligently to collect outstanding receivables and to analyze remaining creditors' claims. Once the universe of claims against the Debtor and Cash available to pay such claims became clearer, the Debtor again reached out to trade creditors through a formal letter dated September 9, 2013 to explain the range of anticipated recovery. A copy of this second letter to trade creditors is attached to the Lyon Declaration as Exhibit B. Consistent with the formal letters, the Debtor made an initial pro rata distribution to creditors, representing roughly 5% of outstanding undisputed claims, and sent out an accompanying letter on September 23, 2013. This third letter to trade creditors is attached to the Lyon Declaration as Exhibit C.

While many of the trade creditors exhibited patience and understanding in the Debtor's process of winding down and liquidating its remaining assets, several others initiated legal action against the Debtor and took other aggressive steps to the detriment of the Debtor and its creditor body as a whole. Most notably, on September 19, 2013, Medical Solutions, Inc., an unsecured trade creditor of the Debtor, filed a garnishment proceeding against the Debtor in the Pinal County Superior Court. On or around October 1, 2013, Medical Solutions, Inc. served writs of garnishment on, among others, FirstBank, N.A. As a result of these garnishment proceedings, FirstBank segregated and froze $242,832.31 of the Debtor's funds in one of the Debtor's accounts at FirstBank.

The Debtor contacted counsel for Medical Solutions and explained the avoidance action, bankruptcy, and recovery dilution ramifications of Medical Solutions' garnishment actions. Medical Solutions refused, however, to abate its garnishment actions.

Thus, while the Debtor had initially hoped to avoid this chapter 11 filing, garnishment proceedings pursued by Medical Solutions, together with the aggressive actions of several other of the Debtor's creditors, have necessitated the filing of this chapter 11 case to ensure an orderly liquidation and accompanying distribution for the benefit of all creditors.

Through this bankruptcy, the Debtor will complete the orderly wind-down of any remaining assets and operations, address any disputed, contingent, or unliquidated claims, prosecute claims on behalf of the Debtor, and distribute estate assets under the Plan.

10

# III. SIGNIFICANT EVENTS IN CHAPTER 11 CASE

## A. Automatic Stay; Administrative Status

The Chapter 11 Case was assigned to the Honorable Eileen W. Hollowell, United States Bankruptcy Judge for the District of Arizona. Since the Petition Date, the Debtor has operated as a debtor-in-possession under Bankruptcy Code §§ 1107 and 1108. The Debtor hired Squire Sanders (US) LLP as its general bankruptcy counsel and Odyssey Capital Group, LLC as its Chief Restructuring Officer.

An immediate effect of the commencement of the Chapter 11 Case was the imposition of the automatic stay under Bankruptcy Code § 362 that, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtor, and the commencement or continuation of litigation against the Debtor. This relief provided the Debtor with the "breathing room" necessary to pursue its business objectives in the Chapter 11 Case without undue pressure or litigation by Creditors. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of the Plan.

## B. "First Day" and Administrative Orders

At the beginning of the Chapter 11 Case, the Bankruptcy Court entered several orders that the Debtor requested for purposes of maintaining ongoing wind-down activities. These orders, among other things, authorized the Debtor to pay certain prepetition claims and granted other relief necessary to facilitate the Debtor's continued wind-down. The orders authorized, among other things:

- the retention of Squire Sanders as restructuring counsel to the Debtor;

- the retention of Odyssey Capital as Chief Restructuring Officer to the Debtor; and

- the payment of employees' accrued prepetition wages and obligations associated with the Debtor's employee benefits plans.

## C. Appointment of Official Committee of Unsecured Creditors

On November 4, 2013, the U.S. Trustee appointed the 3M Company, Health Temp, and Healthcare Systems Group, Inc. to serve on the Committee.

# IV. DESCRIPTION OF THE PLAN

## A. Introduction

This section provides a summary of the Plan's structure, classification, treatment, and implementation. Although the statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to in the Plan, this Disclosure Statement is not a precise or complete statement of all the terms and provisions of the

Plan or documents referred to in the Plan. Refer to the Plan and its exhibits for a complete statement of all the Plan's terms.

The Plan itself and the documents it refers to will control the treatment of holders of Claims against, and Equity Interests in, the Debtor under the Plan and will, on the Effective Date, be binding on all parties-in-interest, including holders of Claims against, and Equity Interests in, the Debtor. The Plan is designed to effect the complete liquidation of the Debtor's assets and a distribution of all Cash proceeds of that liquidation to Creditors.

**B.      Summary of Claims Process, Bar Date, and Professional Fees**

The Bankruptcy Court entered an order (the "*Bar Date Order*") setting December 6, 2013 as the deadline for filing proofs of claim against the Debtor (the "*Bar Date*"). The Bar Date does not apply to certain types of Claims, including Administrative Claims, Professional Fee Claims, and Rejection Claims arising after the Bar Date, as to which the bar date is controlled by provisions of the Plan and orders of the Bankruptcy Court authorizing the rejection of contracts or leases. Notice of the Bar Date was mailed to each person listed in the Schedules along with a copy of the Bar Date Order and a proof of claim form. In addition, the Debtor published notice of the Bar Date in the Arizona Republic and the East Valley Tribune.

All Administrative Claims, Professional Fee Claims and Rejection Claims must be filed on or before the date that is the first Business Day that is 30 days after the Confirmation Date.

**C.      Classification and Treatment of Claims and Equity Interests, Generally**

Bankruptcy Code § 1122 requires that a chapter 11 plan classify the claims of a debtor's creditors and the interests of its equity holders. The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a chapter 11 plan may place a claim of a creditor or an interest of an equity holder in a particular class only if the claim or interest is substantially similar to the other claims or interests of that class. The Bankruptcy Code also requires that a chapter 11 plan provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest.

The Debtor and the Committee believe that they have classified all Claims and Equity Interests in compliance with the requirements of the Bankruptcy Code. If a holder of a Claim or Equity Interest challenges the Plan's classification of Claims or Equity Interests and the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtor and the Committee, to the extent permitted by the Bankruptcy Court, intend to modify the classifications of Claims or Equity Interests under the Plan to provide for whatever classification might be required by the Bankruptcy Court for confirmation. Except if a modification of classification adversely affects the treatment of a holder of a Claim or Equity Interest, acceptance of the Plan by any holder of a Claim or Equity Interest will be deemed to be a consent to the Plan's treatment of the holder of a Claim or Equity Interest regardless of the class as to which that holder ultimately is deemed to be a member.

12

**D.    Treatment of Unclassified Claims**

As provided in Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims are not classified for purposes of voting on, or receiving distributions under, the Plan. Holders of Administrative Claims and Priority Tax Claims are not entitled to vote on the Plan but, rather, are treated separately in accordance with Sections 2.02 and 2.03 of the Plan and under Bankruptcy Code § 1129(a)(9)(A).

1.    *Allowed Administrative Claims*

An Administrative Claim is a Claim for any cost or expense of administration of the Chapter 11 Case Allowed under Bankruptcy Code §§ 503(b), 507(b) or 546(c)(2) and entitled to priority under Bankruptcy Code § 507(a)(2), including: (a) fees payable under 28 U.S.C. § 1930; (b) actual and necessary costs and expenses incurred in the ordinary course of the Debtor's business; (c) actual and necessary costs and expenses of preserving the Estate or administering the Chapter 11 Case; and (d) all Professional Fee Claims to the extent Allowed by Final Order under Bankruptcy Code §§ 330, 331, or 503.

The Debtor estimates that, assuming an Effective Date around January 15, 2014, unpaid Allowed Administrative Claims will total approximately $300,000, principally comprising Professional Fees.

2.    *Priority Tax Claims*

These are Claims of a Governmental Unit for taxes entitled to priority under Bankruptcy Code § 507(a)(8).

3.    *Professional Fees*

Claims for Professional Fees are Claims of Professionals, including an entity (a) employed in the Chapter 11 Case in accordance with an order of the Bankruptcy Court under Bankruptcy Code §§ 327, 328, 363, or 1103 and to be compensated for services under Bankruptcy Code §§ 327, 328, 329, 330, and 331 or order of the Bankruptcy Court; or (b) for whom compensation and reimbursement has been Allowed by a Final Order under Bankruptcy Code § 503(b).

4.    *Treatment.*

(i)    <u>Allowed Administrative Claims</u>. Each Allowed Administrative Claim (other than a Professional Fee Claim) will be paid in full in Cash (or otherwise satisfied in accordance with its terms) on the latest of: (a) the Effective Date, or as soon after that date as feasible; (b) any date the Bankruptcy Court may fix, or as soon after that date as feasible; (c) 30 days after the Claim is Allowed; and (d) any date on which the holder of the Claim and the Debtor or the Liquidation Trust agree.

(ii)    <u>Allowed Priority Tax Claims</u>. Any Allowed Priority Tax Claim will be paid in full in Cash on the latest of: (a) the Effective Date (or as soon after that date as feasible); and (b) 30 days after the Claim is Allowed. The Liquidation Trust may elect to pay any Allowed

13

Priority Tax Claim through regular installment payments in Cash of a total value, as of the Effective Date, equal to the Allowed amount of the Claim, over a period ending not later than five years after the Petition Date, and in a manner not less favorable than the most favored General Unsecured Claim provided for by the Plan. If the Liquidation Trust so elects, the installment payments will be made in equal quarterly installments of principal plus interest, at a rate determined under applicable nonbankruptcy law, on the unpaid portion of the Allowed Priority Tax Claim accruing from the Effective Date. The first payment will be made on the latest of: (a) the Effective Date, or as soon after that date as feasible; (b) 30 days after the Claim is Allowed, or as soon after that date as feasible; and (c) another date on which the holder of the Claim and the Liquidation Trust agree. The Liquidation Trust retains the right to prepay any Allowed Priority Tax Claim, or any remaining balance of such a Claim, in full or in part, at any time on or after the Effective Date without premium or penalty.

(iii)    _Professional Fee Claims_. Each Allowed Professional Fee Claim will be paid in full in Cash on the latest of: (a) three days after the Professional Fee Claim is Allowed; and (b) another date on which the holder of the Professional Fee Claim and the Liquidation Trust agree. Each Person seeking an award by the Bankruptcy Court of Professional Fees must file with the Bankruptcy Court and serve on the Liquidation Trust its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by the Professional Fee Bar Date.

All claims of Professionals for services rendered or expenses incurred after the Effective Date in connection with the Chapter 11 Case and the Plan including those relating to consummation of the Plan, any appeal of the Confirmation Order, the preparation, filing, and review of Professional Fee Claims, the prosecution of Avoidance Actions and Litigation Claims, and the resolution of Disputed Claims, will be paid by the Liquidation Trust on receipt of an invoice, or on other terms on which the Liquidation Trust and the Professional agree, without the need for further Bankruptcy Court authorization or entry of a Final Order.

**E.    Treatment of Classified Claims and Interests**

In accordance with Bankruptcy Code § 1123(a)(1), set forth below is a designation of classes of Claims against, and Equity Interests in, the Debtor (except the unclassified Claims receiving the treatment described in Section IV.D above). A Claim or Equity Interest is placed in a particular Class for the purpose of receiving distributions in accordance with the Plan only if that a Claim or Equity Interest has not been paid, released, or otherwise settled before the Effective Date. The treatment of classified Claims and Equity Interests and the provisions governing distributions on account of Allowed Claims and Allowed Equity Interests is set forth in Articles 3 and 4 of the Plan. You should refer to the Plan itself for the complete provisions governing the treatment of your particular Claim or Equity Interest.

1.    *Class 1 (Priority Claims)*

Class 1 consists of all Priority Claims other than Priority Tax Claims. Class 1 is unimpaired by the Plan. All holders of Allowed Priority Claims are deemed to have accepted the Plan and will not be solicited to vote on the Plan. Each holder of an Allowed Priority Claim other than a Priority Tax Claim will receive Cash in an amount equal to its Allowed Priority Claim on

14

the later of: (i) the Effective Date, or as soon after that date as feasible; and (ii) 30 days after the Priority Claim is Allowed; unless, before the later of those two dates, the holder of the Claim and the Liquidation Trust agree in writing to a different date.

   2.   *Class 2 (General Unsecured Claims)*

Class 2 consists of all Allowed General Unsecured Claims, including Rejection Claims but excluding Sierra Equities Claims and De Lage Landen Claims. Class 2 is impaired by the Plan. All holders of Allowed General Unsecured Claims are entitled to vote and will be solicited to vote on the Plan. Each holder of an Allowed Class 2 Claim will receive, in full and final satisfaction of its Allowed Class 2 Claim, a Pro Rata beneficial interest in the Liquidation Trust.

The Debtor estimates that the Allowed General Unsecured Claims will total approximately $12.0 million,[6] consisting primarily of claims prepetition vendors and other similarly situated unsecured creditors.

   3.   *Class 3 (Sierra Equities Claims)*

Class 3 consists of all Allowed Sierra Equities Claims. Class 3 is impaired by the Plan. All holders of Allowed Class 3 Claims are entitled to vote and will be solicited to vote on the Plan. Each holder of an Allowed Class 3 Claim will receive, in full and final satisfaction of its Allowed Class 3 Claim, a Pro Rata beneficial interest in the Liquidation Trust.

The Debtor estimates that the Allowed Sierra Equities Claims will total approximately $3.2 million.[6]

   4.   *Class 4 (De Lage Landen Claims)*

Class 4 consists of all Allowed De Lage Landen Claims. Class 4 is impaired by the Plan. All holders of Allowed Class 4 Claims are entitled to vote and will be solicited to vote on the Plan. Each holder of an Allowed Class 4 Claim will receive, in full and final satisfaction of its Allowed Class 4 Claim, a Pro Rata beneficial interest in the Liquidation Trust.

The Debtor estimates that the Allowed De Lage Landen Claims will total approximately $48,000.[6]

   5.   *Class 5 (Equity Interests)*

Class 5 consists of all Equity Interests and Claims subordinated to all other Claims. Class 5 is impaired by the Plan. All holders of Equity Interests and such subordinated claims are deemed to reject the Plan and will not be solicited to vote on the Plan. The holders of Equity Interests and such subordinated Claims will not receive or retain any rights, property, or distributions on account of their Equity Interests or Claims under the Plan.

---

[6]   This figure is an estimate only. The Debtor, the Committee, and the Liquidating Trustee reserve all rights with respect to filing, prosecuting, and settling objections to Claims.

## V. IMPLEMENTATION OF THE PLAN

### A. Effective Date Funding

Funds needed to make Cash payments on and after the Effective Date on account of Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Claims under the Plan will come from the Debtor's Cash. The Debtor must reserve sufficient Cash on the Effective Date to pay all Administrative Claims, Priority Tax Claims, and Priority Claims in the Maximum Amount. All Cash not so reserved vests in the Liquidation Trust on the Effective Date. Any Cash remaining on reserve after all Administrative Claims, Priority Tax Claims, and Priority Claims have been either Disallowed or Allowed and paid in accordance with the Plan vests in the Liquidation Trust.

### B. Liquidation Trust

On the Effective Date, the Liquidation Trust will be formed and vested with all assets of the Estate other than the Cash reserved under Section 4.01 of the Plan for payments to holders of Administrative Claims, Priority Tax Claims, and Priority Claims. The Liquidation Trust will be administered by the Liquidation Trustee, who will be appointed on the Effective Date. All holders of Allowed Claims in Classes 2, 3, and 4 will be the beneficiaries of the Liquidation Trust, which will be administered for those Creditors' sole benefit.

1. *The Liquidation Trustee.*

John P. Madden will begin serving as the Liquidation Trustee on the Effective Date. Mr. Madden is a highly-experienced financial advisor and has served as the Committee's financial advisor. A copy of Mr. Madden's CV is attached as **Appendix 3** to this Disclosure Statement.

The Liquidation Trustee:

(i)     is a fiduciary of the beneficiaries of the Liquidation Trust, which are the holders of Allowed General Unsecured Claims in Class 2, Allowed Sierra Equities Claims in Class 3, and Allowed De Lage Landen Claims in Class 4;

(ii)    must administer the Liquidation Trust for the benefit of its beneficiaries;

(iii)   must make distributions from the Liquidation Trust to its beneficiaries strictly in accordance with the Plan;

(iv)    must use his reasonable best efforts to maximize the value of, and liquidate into Cash, all the Liquidation Trust's non-Cash assets, make timely distributions to beneficiaries, and not unduly prolong the existence of Liquidation Trust, which must wind down and dissolve after liquidating all its assets and distributing all Cash proceeds of that liquidation to the beneficiaries;

(v) must control and manage the Liquidation Trust's assets, including, as necessary or appropriate: (A) selling assets and collecting proceeds; (B) filing, prosecuting, and settling objections to Claims; (C) prosecuting and settling Avoidance Actions and Litigation Claims; and (D) making distributions to the Liquidation Trust's beneficiaries in accordance with the Plan;

(vi) may retain any Professional deemed necessary in its discretion to assist in the administration of Claims and assets, prosecution of Avoidance Actions and Litigation Claims, and as otherwise needed to carry out the Liquidation Trust's business, with any such Professionals to be paid either from available Cash or on other terms to which the Liquidation Trustee and the Professional agree;

(vii) subject to applicable law, will not be liable for any act or omission, except to the extent that the act or omission is determined by a court of competent jurisdiction to be the result of gross negligence, fraud, or willful misconduct (this limitation on liability applies equally to the agents, employees, and Professionals acting on the Liquidation Trust's behalf; all Persons dealing with the Liquidation Trust will be required to look solely to the Liquidation Trust's assets for the enforcement of any claims against the Liquidation Trust);

(viii) is compensated on an hourly basis in accordance with the terms of the order in the Chapter 11 Case employing Emerald Capital Advisors;

(ix) may: (A) file monthly interim fee notices with the Bankruptcy Court, detailing the services performed and costs incurred for which he seeks compensation and reimbursement; (B) be paid from available funds, 14 days after filing the related fee notice with the Bankruptcy Court, unless objections are filed within that 14-day period; (C) if no objections are timely filed, may receive full payment requested or, if an objection is timely filed, may receive payment of the uncontested portion; (D) file a final fee notice, detailing total distributions, and the total fees requested, under Bankruptcy Code § 326, with the Bankruptcy Court retaining jurisdiction to resolve any disputes regarding the reasonableness of the Liquidation Trustee's fees and expenses.

2. *Purposes.*

The Liquidation Trust may operate, and its assets may be used, solely for the purposes of: (i) investigating, enforcing, abandoning, prosecuting and resolving (by litigation, settlement, or otherwise) the Avoidance Actions, the Litigation Claims, and all Disputed Claims; (ii) collecting on or liquidating all its non-Cash assets; (iii) distributing all Cash to its beneficiaries; and (iv) after all non-Cash assets are liquidated and all Cash is distributed, winding down and dissolving.

3. *Disputed Claims.*

The Liquidation Trust must manage Cash distributions to beneficiaries so as to reserve sufficient Cash to make appropriate distribution on account of any beneficial interest attributable to a Disputed General Unsecured Claim, Disputed Sierra Equities Claim, or Disputed De Lage Landen Claim as if that Disputed Claim were an Allowed Claim on the Effective Date in the Maximum Amount. If and when any Disputed General Unsecured Claim, Disputed Sierra

17

Equities Claim, or Disputed De Lage Landen Claim becomes an Allowed General Unsecured Claim, Allowed Sierra Equities Claim, or Allowed De Lage Landen Claim, Cash sufficient to make appropriate distribution to the holder that Claim will be made from such reserves. If a Disputed General Unsecured Claim, Disputed Sierra Equities Claim, or Disputed De Lage Landen Claim becomes a Disallowed Claim, all reserved distributions attributable to the holder of that Disputed Claim will become available for Pro Rata distribution to all holders of beneficial interests in the Liquidation Trust.

4.    *Section 1145 Exemption.*

In accordance with Bankruptcy Code § 1145, the issuance under the Plan of the beneficial interests in the Liquidation Trust is exempt from all federal, state, or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker dealer in such securities and is deemed to be a public offer of such securities.

## VI.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Rejection of Contracts and Leases

All executory contracts and unexpired leases between the Debtor and any Person either (a) set forth on the schedule of rejected executory contracts and unexpired leases filed with the Bankruptcy Court as part of Exhibit B to the Plan or (b) existing but not listed on Exhibit B to the Plan are deemed rejected as of the Effective Date, except for any executory contract or unexpired lease that has been assumed or rejected in accordance with a Final Order entered on or before the Confirmation Date.

Entry of the Confirmation Order constitutes the approval under Bankruptcy Code § 365 of the rejection of the executory contracts and unexpired leases rejected under the Plan.

### B.    Rejection Damages Bar Date

All Rejection Claims must be filed with the Bankruptcy Court by the later of (a) 30 days after the Confirmation Date and (b) 30 days after the applicable executory contract or unexpired lease is rejected under the Plan. Any Rejection Claim not filed within that time is forever barred. With respect to any executory contract or unexpired lease rejected by the Debtor before the Confirmation Date, the deadline for filing a Rejection Claim remains the deadline set forth in the order of the Bankruptcy Court authorizing that rejection. If such an order did not contain such a deadline, the deadline for filing a Rejection Claim is 30 days after the Confirmation Date.

### C.    Indemnification Obligations

Any obligation of the Debtor to indemnify any Person serving as a fiduciary of any employee benefit plan or employee benefit program of the Debtor, under charter, by-laws, contract, or applicable state law is deemed to be an executory contract and rejected as of the Confirmation Date (but subject to the occurrence of the Effective Date). Any obligation of the Debtor to indemnify, reimburse, or limit the liability of any Person, including but not limited to any officer or director of the Debtor, or any agent, professional, financial advisor, or underwriter

18

of any securities issued by the Debtor related to any acts or omissions occurring before the Petition Date is rejected and canceled under the Plan as of the Confirmation Date (but subject to the occurrence of the Effective Date). Any Claim resulting from these rejections in favor of any Person must be filed no later than 30 days after the Confirmation Date and is a Class 2 Claim. Notwithstanding any of the foregoing, nothing contained in the Plan affects the rights of any Person covered by any applicable D&O Policy with respect to any such policy.

**D.    Benefit Plans**

Any Benefit Plans not already terminated before the Petition Date are rejected and terminated as of the Confirmation Date (subject to the Effective Date occurring, if not earlier terminated). Such terminations will be carried out as soon after the Effective Date as possible in conformity with each Benefit Plan's terms and all statutory and regulatory requirements, including any applicable notice provisions. To ensure that the Benefit Plans' terminations comply with the Benefit Plans' terms and applicable statutes and regulations, the Debtor will obtain any necessary approvals of the relevant regulatory agencies, such as the Pension Benefit Guaranty Corporation, the IRS, and the U.S. Department of Labor, in respect of such terminations. Any undistributed, vested benefits of the terminated Benefit Plans will be distributed to the participants as provided by applicable statutes and regulations and the Benefit Plans' provisions as soon as practicable after termination of the Benefit Plans is complete. The Bankruptcy Court retains jurisdiction to hear and determine any disputes relating to the termination of any Benefit Plans.

**VII.    DESCRIPTION OF OTHER PROVISIONS OF THE PLAN**

**A.    Vesting of Assets**

Except as provided in the Plan or the Confirmation Order, all property of the Estate vests in the Liquidation Trust on the Effective Date free and clear of all Liens and Claims existing before the Effective Date. From and after the Effective Date, the Liquidation Trust may use and dispose of property free of any restrictions of the Bankruptcy Code, including the employment of, and payment to, Professionals except as otherwise provided in the Plan or the Confirmation Order.

**B.    Injunction**

Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, all entities that have held, currently hold, or may hold a Claim that is unclassified by the Plan or that is classified by Section IV.E of the Plan or that is subject to a distribution under the Plan, or an Equity Interest or other right of an equity holder, are permanently enjoined from taking any of the following actions on account of any such Claims or Equity Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against any property to be distributed under the Plan; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against any property to be distributed under the Plan; (c) creating, perfecting, or enforcing any Lien or encumbrance against any property to be distributed under the Plan; and (d) commencing or continuing any action, in any manner, in any place, that does not comply with or is inconsistent with the provisions of the Plan or the

19

Bankruptcy Code. Nothing in the Plan is to be construed or is to have the effect of extinguishing, prohibiting, or otherwise limiting, the right of any holder of a Claim to assert a right to setoff or recoupment arising in connection with that Claim as part of the resolution and treatment of that Claim under the Plan. Nothing in the Plan is to be construed or is to have the effect of extinguishing, prohibiting, or otherwise limiting, the right of the Estate or the Liquidation Trust to assert and prevail on any Avoidance Action or Litigation Claim. Nothing in the Plan enjoins or otherwise precludes (or may be construed to enjoin or otherwise preclude) any party in interest from enforcing the terms of the Plan and the Confirmation Order.

## C.    Exculpation

None of the Debtor, the Liquidation Trust, the Committee, or any of their respective members, officers, directors, trustees, employees, advisors, professionals, or agents (other than those Persons identified as a possible defendant on Exhibit A) have or will incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtor, the Liquidation Trust, the Committee, and each of their respective members, officers, directors, trustees, employees, advisors, professionals, and agents are entitled to rely on the advice of counsel with respect to their duties and responsibilities under the Plan.

## D.    Avoidance Actions and Litigation Claims

All Avoidance Actions and Litigation Claims are retained and reserved for the Liquidation Trust, which is designated as the Estate's representative under Bankruptcy Code § 1123(b)(3)(B) for purposes of the Avoidance Actions and Litigation Claims. The Liquidation Trust has authority to prosecute, defend, compromise, settle, and otherwise deal with any Avoidance Actions and Litigation Claims in its capacity as a representative of the Estate in accordance with Bankruptcy Code § 1123(b)(3)(B). The Liquidation Trust will pay the fees and costs associated with litigating the Avoidance Actions and the Litigation Claims. The Liquidation Trust has sole discretion to determine in its business judgment which Avoidance Actions and Litigation Claims to pursue, which to settle, and the terms and conditions of those settlements.

## E.    Retention of Jurisdiction After the Effective Date

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain as much jurisdiction over the Chapter 11 Case after the Effective Date as legally permissible, including jurisdiction to:

- Allow, disallow, determine, liquidate, classify, estimate, or establish the amount, priority, or secured or unsecured status of any Claim, and resolve any request for payment of any Administrative Claim and any objection to the Allowance or priority of any Claim;

- Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized under the Bankruptcy Code or the Plan;

20

- Resolve any matters related to the assumption or rejection of any executory contract or unexpired lease to which the Debtor is a party and to hear, determine and, if necessary, liquidate any Claims arising from such rejection;

- Ensure that distributions required under the Plan are accomplished in accordance with the Plan;

- Decide or resolve any motions, adversary proceedings, contested matters, and any other matters and grant or deny any applications or motions involving the Debtor that may be pending on the Effective Date;

- Enter any necessary or appropriate orders to implement or consummate the Plan's provisions and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

- Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan, or any Person's obligations incurred in connection with the Plan;

- Hear and determine any motion or application to modify the Plan before or after the Effective Date under Bankruptcy Code § 1127 or modify the Disclosure Statement or any contract, instrument, release, or other agreement or document issued, entered into, filed, or delivered in connection with the Plan or the Disclosure Statement; or hear or determine any motion or application to remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document issued, entered into, filed or delivered in connection with the Plan or the Disclosure Statement, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

- Issue injunctions, enter and implement other orders, or take any other necessary or appropriate actions to restrain any entity's interference with consummation or enforcement of the Plan;

- Enter and implement any necessary or appropriate orders if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

- Determine any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document issued, entered into, filed, or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

- Issue a final decree and enter an order closing the Chapter 11 Case; and

- Adjudicate the Disputed Claims, the Avoidance Actions, and the Litigation Claims and any other cause of action or claims of the Estate.

# VIII.   ACCEPTANCE AND CONFIRMATION OF THE PLAN

## A.    Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired Claims and Equity Interests accept the Plan, except under certain circumstances. Bankruptcy Code § 1126(c) defines acceptance of a plan by a class of impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of Claims in that Class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Under Bankruptcy Code § 1126(d), a Class of Equity Interests has accepted the Plan if holders of such Equity Interests holding at least two-thirds in amount actually voting have voted to accept the Plan. Bankruptcy Code § 1126(f) deems a Class of Claims or Equity Interests to have accepted the Plan without voting if that Class is unimpaired under the definition in Bankruptcy Code § 1124. Class 1 under the Plan is unimpaired and, therefore, is deemed to accept the Plan. Classes 2, 3, and 4 are impaired under the Plan and, therefore, will be solicited to vote on the Plan. Class 5 under the Plan is impaired but will receive or retain no property under the Plan and, therefore, is deemed to reject the Plan without voting.

## B.    Feasibility of the Plan

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor. This requirement is imposed by Bankruptcy Code § 1129(a)(11) and is popularly referred to as the "feasibility" requirement. The Debtor and Committee believe that they or the Liquidation Trust will be able to perform timely all obligations described in the Plan and, therefore, that the Plan is feasible.

To demonstrate the feasibility of the Plan, the Debtor and the Committee refer to the Effective Date Balance Sheets included in **Appendix 4**. This document demonstrates that the Debtor will have sufficient Cash on hand as of the Effective Date to make, on the Effective Date, all payments on account of all Administrative Claims and Priority Claims and that substantial funds will remain for vesting in the Liquidation Trust.

Accordingly, the Debtor and Committee believe that the Plan satisfies the feasibility requirement of Bankruptcy Code § 1129(a)(11). The Debtor and Committee caution that no representations can be made as to the accuracy of the Effective Date Balance Sheet or as to the Liquidation Trust's ability to achieve the projected results. Certain of the assumptions on which the Effective Date Balance Sheet are based are subject to uncertainties outside the Debtor's control. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the Effective Date Balance Sheet was prepared may be different from those assumed or may be unanticipated, and may adversely affect the Debtor's or the Liquidation Trust's financial results. Therefore, the actual results can be expected to vary from the projected results and the variations may be material and adverse.

The Effective Date Balance Sheet was not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the practices recognized to be in accordance with generally accepted accounting principles, or the

rules and regulations of the Securities and Exchange Commission regarding projections. Furthermore, the Effective Date Balance Sheet has not been audited by independent accountants. Although presented with numerical specificity, the Effective Date Balance Sheet is based on a variety of assumptions, some of which in the past have not been achieved and which may not be realized in the future, and are subject to significant business, economic and competitive uncertainties and contingencies, and many of which are beyond any party's control. Consequently, the Effective Date Balance Sheet should not be regarded as a representation or warranty by the any Person, that projections will be realized. Actual results may vary materially from those presented.

## C.      Best Interests Test

### 1.      *Explanation*

Even if a plan is accepted by each class of claim holders, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in Bankruptcy Code § 1129(a)(7), requires a bankruptcy court to find either that: (i) all members of an impaired class of claims or interests have accepted the plan; or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor was liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by: (1) the claims of any secured creditors to the extent of the value of their collateral; and (2) the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a Chapter 7 trustee, as well as of counsel and other professionals retained by the Chapter 7 trustee, asset disposition expenses, all unpaid expenses incurred by the Debtor or the Chapter 11 Trustee in the bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors from the remaining available proceeds in liquidation. If the probable distribution has a value greater than the distributions to be received by such creditors under the plan, then the plan is not in the best interests of creditors and equity security holders.

2.    *Application of the Liquidation Analysis*

A liquidation analysis prepared with respect to the Debtor is attached as **Appendix 5** to this Disclosure Statement. The Debtor and the Committee believe that any liquidation analysis is speculative. For example, the liquidation analysis necessarily contains an estimate of the amount of Claims that will ultimately become Allowed Claims. In preparing the liquidation analysis, the Debtor and the Committee have projected the amount of Allowed Claims based on a review of the Schedules, the Debtor's books and records, and filed proofs of claim. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the liquidation analysis. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims and Allowed Interests under the Plan.

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtor and the Committee believe that, taking into account the liquidation analysis, the Plan meets the "best interests" test of Bankruptcy Code § 1129(a)(7). The Debtor and the Committee believe that each member of each Class will receive at least as much under the Plan as it would in a liquidation in a hypothetical Chapter 7 case. Creditors will receive a better recovery through the distributions contemplated by the Plan because avoiding the additional costs and delay of a Chapter 7 trustee and the trustee's new set of professionals, including statutory fees owing to the Chapter 7 trustee, will allow the realization of more value for Creditors.

## IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

A summary description of certain United States federal income tax consequences ("*Tax Consequences*") of the Plan follows. This description is for informational purposes only and, owing to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various Tax Consequences of the Plan discussed below. This disclosure describes only the principal Tax Consequences of the Plan to the Debtor and to holders of Claims and Equity Interests. No opinion of counsel has been sought or obtained with respect to any Tax Consequences of the Plan. No rulings or determinations of the IRS or any other tax authorities have been sought or obtained with respect to any Tax Consequences of the Plan, and the discussion below is not binding on the IRS or other authorities. No representations are being made to the Debtor or any holder of a Claim or Equity Interest regarding the particular Tax Consequences of the confirmation and consummation of the Plan. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed here.

The following discussion of the Tax Consequences is based on the Internal Revenue Code of 1986, as amended, (the "*Code*") Treasury Regulations, judicial authorities, published positions of the IRS and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).

24

The following discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the Tax Consequences of the Plan to special classes of taxpayers (*e.g.,* banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, persons that are, or hold their Claims through, pass-through entities, persons whose functional currency is not the United States dollar, foreign persons, dealers in securities or foreign currency, employees of the Debtor, persons who received their Claims by exercising an employee stock option or otherwise as compensation, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction). Furthermore, the following discussion does not address United States federal taxes other than income taxes.

Holders of Claims and Equity Interests are strongly urged to consult their own tax advisor regarding the United States federal, state, local, and foreign tax consequences of the transactions described in this Disclosure Statement and in the Plan.

## B.    United States Federal Income Tax Consequences to the Debtor

The Debtor is a limited liability company taxed as a partnership for United States federal income tax purposes ("*Tax Purposes*"). A partnership is not a taxable entity; rather, any gains, losses or other items of income or deductions or credit realized by the Debtor ("*Tax Items*") will be passed through to the holders of Equity Interests. The fact that the Debtor is subject to a Chapter 11 proceeding will not change this result. Thus, the Chapter 11 bankruptcy proceeding has no impact on the Tax Consequences of the transactions contemplated by the Plan.

## C.    Federal Income Tax Consequences to Creditors

1.    *Generally*

The following discusses certain Tax Consequences of the transactions contemplated by the Plan to Creditors that are "United States holders," as defined below. The Tax Consequences of the transactions contemplated by the Plan to Creditors (including the character, timing and amount of income, gain or loss recognized) will depend on, among other things: (1) whether the Claim and the consideration received in respect of it are "securities" for Tax Purposes; (2) the manner in which a Creditor acquired a Claim; (3) the length of time the Claim has been held; (4) whether the Claim was acquired at a discount; (5) whether the Creditor has taken a bad debt deduction with respect to the Claim (or any portion of it) in the current tax year or any prior tax year; (6) whether the Creditor has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (7) the holder's method of tax accounting; and (8) whether the Claim is an installment obligation for Tax Purposes. Creditors, therefore, should consult their own tax advisors regarding the particular Tax Consequences to them of the transactions contemplated by the Plan.

For purposes of the following discussion, a "United States holder" is a Creditor that is: (1) a citizen or individual resident of the United States; (2) a partnership, limited liability company, or corporation created or organized in the United States or under the laws of the United States, a political subdivision of the United States, or a State of the United States; (3) an estate whose income is subject to United States federal income taxation regardless of its source;

or (4) a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust, or (ii) the trust was in existence on August 20, 1996, and properly elected to be treated as a United States person.

Each holder of a Class 2, 3 or Class 4 Allowed Claim may be permitted to recognize a loss or may be required to recognize gain on the distribution to it of its beneficial interests in the Liquidation Trust under the terms of the Plan or on the distribution of the Liquidation Trust's cash on account of the holder's beneficial interest. The loss (or gain) to be recognized by the holder of a Class 2, 3 or Class 4 Allowed Claim will equal the positive difference in the case of a loss (and negative difference in the case of a gain) between (1) the adjusted tax basis such holder has in its Class 2, 3 or Class 4 Allowed Claim (excluding any adjusted tax basis attributable to accrued but unpaid interest), and (2) the fair market value of the beneficial interest distributed (or deemed distributed) to the holder of the Class 2, 3 or Class 4 Allowed Claim (excluding any cash or property received or deemed received attributable to accrued interest). Depending on the manner in which the Class 2, 3 or Class 4 Claim arose, applicability of the market discount rules and other factors, such loss (or gain) may be capital or ordinary in nature. Due to limitations in the Code, a holder of a Class 2, 3 or Class 4 Claim that recognizes a capital loss relating to its Class 2, 3 or Class 4 Claim may not be able to utilize such capital loss in the taxable year it arises or possibly ever.

Although many holders of Class 2, 3 or Class 4 Claims will not be required to recognize gain or income as a result of the property distributions (including cash distributions) made or deemed to be made to them under the terms of the Plan, certain situations may exist which will require a holder of a Class 2, 3 or Class 4 Claim to do so. For example, if a Class 2, 3 or Class 4 Claim relates to a transaction under which the holder is required to recognize gain on payment (for example, an installment sale), the holder may be required to recognize gain as a result of the actual or deemed distributions made to it under the Plan. Moreover, if (1) a holder of a Class 2, 3 or Class 4 Claim previously took a deduction or loss relating to the partial or entire worthlessness of its Class 2, 3 or Class 4 Claim, and (2) the fair market value of the property (including cash) it receives or is deemed to receive for its Class 2, 3 or Class 4 Claim under the Plan exceeds the remaining adjusted tax basis, if any, it has in its Class 2, 3 or Class 4 Claim, such holder will be required to recognize gain or income. Similarly, a holder of a Class 2, 3 or Class 4 Claim that purchased its Claim at a discount may be required to recognize gain if the amount received in satisfaction of the Claim exceeds such holder's adjusted tax basis in the Claim. There are several other reasons why a holder of a Class 2, 3 or Class 4 Claim may be required to recognize gain or income as a result of the actual and/or deemed distributions made to it under the Plan. Therefore, each holder of a Class 2, 3 or Class 4 Claim should consult its own tax advisor to determine the tax consequences to it of the receipt of or deemed receipt of property (including cash) under the Plan.

To the extent that the property (including cash) received or deemed to be received by a holder of a Class 2, 3 or Class 4 Claim is attributable to accrued interest on the Class 2, 3 or Class 4 Claim, the cash or property will be deemed made in payment of such interest. While the federal income tax laws are unclear regarding how much consideration may be deemed attributable to accrued interest when partial payments are made on a debt on which both principal and interest are owed, the Debtor intends to treat amounts distributed or deemed

26

distributed under the Plan as attributable first to principal and then to any accrued but unpaid interest. To the extent that the holder of the Class 2, 3 or Class 4 Claim has not yet included the accrued interest in gross income, the fair market value of the cash or property deemed received in payment of such interest will generally be included in the holder's gross income for federal income tax purposes. To the extent the holder has previously included accrued interest on the Class 2, 3 or Class 4 Claim in gross income, the fair market value of the cash or property deemed received in payment of such interest generally will not be included in gross income. The holder of the Class 2, 3 or Class 4 Claim may be able to claim a deductible loss if the fair market value of the cash or property deemed received for the accrued interest is less than the amount the holder had previously included in gross income. Holders of Class 2, 3 or Class 4 Claims should consult with their tax advisors regarding the allocation of distributions between principal and interest.

The beneficial interests in the Liquidation Trust deemed issued to a holder of an Allowed Class 2, 3 or Class 4 Claim on consummation of the Plan will not include any beneficial interests held in reserve for holders of Disputed Claims. As a result, in determining the amount of loss (or gain) recognized by a holder of an Allowed Class 2, 3 or Class 4 Claim on consummation of the Plan, the holder will not be treated as receiving any property attributable to the assets that are held by or for the benefit of holders of Disputed Claims. As discussed below, when a Disputed Claim becomes Disallowed in whole or in part, the holders of Allowed Class 2, 3 or Class 4 Claims will be treated as receiving additional consideration in respect of their Allowed Class 2, 3 or Class 4 Claims at such time. It is possible, however, that the IRS or a court may conclude that the amount of consideration deemed received for tax purposes by a holder of an Allowed Class 2, 3 or Class 4 Claim on consummation of the Plan should be determined by disregarding the Disputed Claims and treating any beneficial interests held in reserve for holders of Disputed Claims as proportionately distributed to the holders of Allowed Class 2, 3 or Class 4 Claims. In such case, appropriate downward adjustments would be made on the allowance of a Disputed Claim in whole or in part. Holders of Class 2, 3 or Class 4 Claims should consult with their tax advisors as to the proper amount of consideration deemed received on consummation of the Plan.

Holders of Disputed Claims will not be treated as receiving any consideration in respect of their claims on consummation of the Plan. On the allowance of a Disputed Claim in Class 2, 3 or Class 4, the holder of the Disputed Claim will be treated as realizing in satisfaction of its Claim the amount of cash distributed to the holder by the Liquidation Trust at such time (except to the extent such cash is attributable to amounts realized by the Liquidation Trust in the fiscal year in which the Disputed Claim becomes Allowed), plus the fair market value of the beneficial interest distributed to such holder. On the disallowance of a Disputed Claim, the beneficial interest attributable to such Disputed Claim will be cancelled and the cash attributable to the Disallowed Disputed Claim and held in reserve will be released from the reserve. While not entirely clear, at such time, such holders of Allowed Class 2, 3 or Class 4 Claims will likely be treated as having received additional consideration in satisfaction of their Allowed Class 2, 3 or Class 4 Claims equal to their proportional shares of (i) the fair market value of the cancelled beneficial interests and (ii) the cash released from the reserve (except to the extent such cash is attributable to amounts realized by the Liquidation Trust in the fiscal year in which the Disputed Claim becomes disallowed). If the Disputed Claim becomes Disallowed in the year in which the Plan is consummated, then such additional consideration would either reduce the loss or increase the gain that was recognized with respect to their Allowed Class 2, 3 or Class 4 Claims on

consummation of the Plan and would possess the same character (*i.e.,* capital or ordinary) as the gain or loss recognized on consummation of the Plan. If the Disputed Claim becomes disallowed after the year in which the Plan is consummated, then the additional amount deemed received on disallowance of the Disputed Claim will be treated as gain with the same character (*i.e.,* capital or ordinary) as the gain or loss recognized on consummation of the Plan. Holders of Allowed Class 2, 3 or Class 4 Claims would increase the tax bases in their beneficial interests by the additional amounts deemed received on the disallowance of a Disputed Claim.

2. *Accrued Interest*

Holders of Claims for accrued interest that previously have not included such accrued interest in taxable income will be required to recognize ordinary income equal to the amount of Cash received under the Plan with respect to such Claims for accrued interest. Holders of Claims for accrued interest that have included such accrued interest in taxable income generally may take an ordinary deduction to the extent that such Claim is not fully satisfied under the Plan (after allocating the distribution between principal and accrued interest), even if the underlying Claim is held as a capital asset. The adjusted tax basis of any Cash received in exchange for a Claim for accrued interest will equal the amount of Cash on the Effective Date, and the holding period for the property will begin on the day after the Effective Date. It is not clear the extent to which consideration that may be distributed under the Plan will be allocable to interest. Creditors are advised to consult their own tax advisors to determine the amount, if any, of consideration received under the Plan that is allocable to interest.

3. *Market Discount*

In general, a debt obligation, other than one with a fixed maturity of one year or less, that is acquired by a holder in the secondary market (or, in certain circumstances, on original issuance) is a "market discount bond" as to that holder if the obligation's stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the holder's adjusted tax basis in the debt obligation immediately after its acquisition. A debt obligation will not, however, be a "market discount bond" if such excess is less than a statutory *de minimis* amount. To the extent that a Creditor has not previously included market discount in its taxable income, gain recognized by a Creditor on the disposition of a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the Creditor's period of ownership. A holder of a market discount bond that is required to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on the disposition of such bond. In addition, any partial principal payment received by a Creditor that is attributable to a market discount bond will generally be treated as ordinary interest income to the extent such payment does not exceed the market discount accrued on such bond during the Creditor's period of ownership.

4. *Original Issue Discount*

The original issue discount ("*OID*") rules provide an extremely detailed and complex method for determining and taxing the interest components of debt instruments. A holder of a debt instrument containing OID must include a portion of the OID in gross income in each

28

taxable year in which the holder holds the debt instrument, regardless of whether any cash payments are received. OID is defined as the difference between the issue price and the stated redemption price at maturity of a debt instrument. As the OID rules are extremely complex, it is not certain how they will apply to the transactions contemplated by the Plan. Accordingly, each Creditor must consult its own tax advisor.

     5.    *Other Claimholders*

If a Creditor reaches an agreement with the Debtor or the Liquidation Trust to have its Claim satisfied, settled, released, exchanged, or otherwise discharged in a manner other than as described in the Plan, that Creditor should consult with its own tax advisors regarding the Tax Consequences of that satisfaction, settlement, release, exchange, or discharge.

     6.    *Information Reporting and Backup Withholding*

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. These reportable payments do not include those that give rise to gain or loss on the exchange of a Claim. Moreover, such reportable payments are subject to backup withholding under certain circumstances. A United States holder may be subject to backup withholding at rate of 28 percent with respect to certain distributions or payments of accrued interest, market discount, or similar items under the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a United States person, the taxpayer identification number is correct, and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Payments that give rise to gain or loss on the exchange of a Claim are not subject to backup withholding. Backup withholding is not an additional tax. Amounts subject to backup withholding are credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess backup withholding by filing an appropriate claim for refund with the IRS.

**D.    Importance of Obtaining Professional Tax Assistance**

**The foregoing discussion is intended only as a summary of certain United States federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The above discussion is for informational purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a Creditor's particular circumstances. Accordingly, Creditors are strongly urged to consult their tax advisors about the United States federal, state and local and applicable foreign income and other tax consequences of the Plan, including with respect to tax reporting and record keeping requirements.**

**IRS Circular 230 Notice: To comply with U.S. treasury regulations, be advised that any U.S. federal tax advice included in this communication (and it is not intended that any such advice be given in this Disclosure Statement) is not intended or written to be used, and cannot be used, to avoid any U.S. federal tax penalties or to promote, market, or recommend to another party any transaction or matter.**

# X.     RISK FACTORS

## A.     Generally

The liquidation of the Debtor involves a degree of risk, however small, and this Disclosure Statement and certain of its Exhibits contain forward-looking statements that involve risks and uncertainty. The Liquidation Trust's actual results could differ materially from those anticipated in such forward-looking statements as a result of a variety of factors, including those set forth in the following risk factors and elsewhere in this Disclosure Statement. **Holders of Claims should consider carefully the following factors in addition to the other information contained in this Disclosure Statement.**

*Liquidation Trustee.* The Liquidation Trust's post-Effective Date performance depends to a great extent on the efforts of the Liquidation Trustee and his professionals. There can be no assurance that the Liquidation Trust will be successful in attracting and retaining the most suitable professionals or that the Liquidation Trustee will perform as well as hoped or expected. Such underperformance could have a material adverse effect on the recoveries of Creditors from the Liquidation Trust.

*Claim Amount Estimates.* The estimated Claims set forth in the Disclosure Statement are based on various assumptions, and the actual amount of Allowed Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual amount of Allowed Claims may vary from the estimated Claims contained in the Disclosure Statement. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

*Litigation Claims.* The Liquidation Trust will undertake to investigate and possibly pursue Litigation Claims against various parties. Realizing recoveries from those Litigation Claims may depend on the Liquidation Trust's ability to obtain contingency fee-based counsel. If necessary and unless the Liquidation Trust is able to hire counsel on that basis, there is a substantial risk that no meaningful recoveries from the Litigation Claims will be realized. Additionally, some of the targets of the Litigation Claims may be partially or completely incapable of paying any judgments that may be obtained against them.

## B.     Risk of Non-Confirmation of the Plan

Although the Debtor and Committee believe that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will agree. There can also be no assurance that modifications of the Plan will not be required for Confirmation, that such negotiations would not adversely affect the holders of Allowed Claims and Equity Interests, or that such modifications would not necessitate solicitation or re-solicitation of votes.

# XI.     ALTERNATIVES TO THE PLAN

The Debtor and Committee believe that the Plan affords holders of Claims the greatest realization on the Debtor's assets and, therefore, is in the best interests of Creditors. But if the Plan is not confirmed, the theoretical alternatives include: (a) continuation of the pending

Case 4:13-bk-18188-EWH    Doc 98    Filed 11/18/13    Entered 11/18/13 12:00:00    Desc
Main Document      Page 34 of 46

Chapter 11 Case without any immediately available financing; (b) an alternative plan; or (c) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code.

## A.    Continuation of the Chapter 11 Case

Since the Plan is designed to distribute a relatively fixed sum of Cash, continuing the Chapter 11 Case would serve no purpose other than increasing costs to the Estate and reducing recoveries to holders of Class 2, 3 or 4 Claims.

## B.    Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtor or, after the exclusivity period, any party-in-interest in the Chapter 11 Case could propose a different plan or plans. Those plans might involve some other form of orderly liquidation of the Debtor's assets.

## C.    Liquidation Under Chapter 7

If no plan is confirmed, the Debtor's Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code. In a Chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtor. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Equity Interests in the Debtor or how that would differ materially from what the Plan provides. The Debtor believes, however, that holders of Claims would lose substantial value if the Debtor were forced to liquidate under Chapter 7 because the additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist those trustees would cause a substantial diminution in the value of the Estate. The assets available for distribution to holders of Claims would be reduced by those additional expenses.

## XII.    CONCLUSION

## A.    Hearing on and Objections to Confirmation

### 1.    *Confirmation Hearing*

The hearing on confirmation of the Plan has been scheduled for [_____], 2013 at [___]:00 a.m. (Arizona time). The hearing may be adjourned from time to time by announcing the adjournment in open court, all without further notice to parties in interest, and the Plan may be modified under Bankruptcy Code § 1127 before, during, or as a result of that hearing, without further notice to parties in interest.

### 2.    *Deadline for Objections to Confirmation*

The time by which any objections to confirmation of the Plan must be filed with the Bankruptcy Court and received by the parties listed in the Confirmation Hearing Notice has been set for [_____], 2013 at 5:00 p.m. (Arizona time).

Case 4:13-bk-18188-EWH    Doc 98    Filed 11/18/13    Entered 11/18/13 12:00:00    Desc
Main Document    Page 35 of 46

## B.  Recommendation

The Plan provides for the best possible and most equitable distribution to Creditors. The Debtor and Committee believe that any alternative to confirmation of the Plan, such as Chapter 7 liquidation or attempts by another party in interest to file a plan, would result in significant delays, litigation, and additional costs with no corresponding benefit. For these reasons, the Debtor and Committee urge you to vote to accept the Plan and to support Confirmation of the Plan.

Dated: November 18, 2013

**SQUIRE SANDERS (US) LLP**

By: ___*/s/ Thomas J. Salerno*___
      Thomas J. Salerno
      Bradley A. Cosman
      K. Derek Judd
One East Washington Street, Suite 2700
Phoenix, Arizona 85004

Counsel to Debtor-In-Possession

Respectfully submitted,

**APACHE JUNCTION HOSPITAL, LLC**

By: ___*/s/ G. Grant Lyon*_____
      G. Grant Lyon
      Chief Restructuring Officer

**ELLIOTT GREENLEAF**

By: ___*/s/ Rafael X. Zahralddin-Aravena*___
      Rafael X. Zahralddin-Aravena
      Jonathan M. Stemerman
1105 N. Market Street, Ste. 1700
Wilmington, DE 19801

Counsel to the Official Committee of Unsecured Creditors

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: ___*/s/ Allen E. Brown*_____
      Allen E. Brown
      Chairman

32

**Appendix 1**

**Plan**

33

**Appendix 2**

**Order Approving Disclosure Statement**

**Appendix 3**

**CV of John P. Madden**



### JOHN P. MADDEN
Senior Managing Director
Emerald Capital Advisors

John P. Madden is the Senior Managing Director and founder of Emerald Capital Advisors. As head of Emerald's Restructuring Advisory practice, Mr. Madden has more than 16 years of direct experience advising various types of clients in all phases of both financial and operational restructurings. He is an expert in leading both Chief Restructuring Officer ("CRO") and interim management assignments for debtor clients as well as investment banking  and financial advisory engagements for both debtor and creditor clients.

Mr. Madden's skills and qualifications cover the full range of distressed situations including: Out-of-court Restructuring; Liquidation Trustee; Claims Analysis; Securities Valuation; Plan Feasibility (Debtor and Creditor); Debtor-in-Possession Financing; Business Valuation; Solvency Analysis; Liquidation Analysis; Litigation Support; and Fraudulent Transfer Actions.

Mr. Madden has advised on more than 50 bankruptcy-related matters. Some of his most notable engagements include ATP Oil & Gas, BHM Technologies, Birch Telecom, Champion Enterprises, ChemRx, Citadel Broadcasting Corporation, Delphi, Enron, Hayes Lemmerz International, ICO / DBSD, Nebraska Book, Omega Navigation Enterprises, Inc., Owens Corning, Party City, Philadelphia Newspapers, Six Flags, Trico Marine Services, Inc., Truvo, and Worldspace Inc.

Current assignments include Coda Automotive, Energy Conversion Devices, Handy Hardware, and iGPS Company, LLC.

Prior to founding Emerald Capital Advisors, Mr. Madden was a Managing Director at Chanin Capital Partners, a subsidiary of Duff & Phelps Securities, LLC, where he led both in and out-of-court restructurings and recapitalizations, including mergers and acquisitions, exchange offerings, capital raising, plan negotiations and structuring, waivers and amendments, rights offerings and operational improvement plans.

Formerly, Mr. Madden was a Director at Zolfo Cooper, where he held positions of increasing responsibility for six years. Mr. Madden developed and implemented financial and operational restructuring plans in turnaround and distressed situations, in addition to the preparation of debt and equity valuations of distressed companies. He was member of the interim senior management team involved in the restructuring of Enron, as director of Restructuring.

Mr. Madden is a recognized expert in the field of financial restructuring. He has given presentations and speeches on various topics over the past decade as well as authored articles and chapters in financial publications. His most recent topics include "Contested Valuation in Corporate Bankruptcy," and the "Debtwire Distressed Market Survey." He has been a panelist and moderator at conferences and symposiums across the United States.

Mr. Madden earned a Bachelor of Science in Business Administration with a concentration in Accounting from Georgetown University.

Mr. Madden is a Certified Insolvency and Restructuring Advisor (CIRA), and holds the Financial Industry Regulatory Authority (FINRA) Series 7, 63, and 79 licenses.

## SELECT REORGANIZATION AND BANKRUPTCY PROFESSIONAL EXPERIENCE

| Case | Advisory Role |
| --- | --- |
| ATP Oil & Gas | Unsecured Creditors Committee Financial Advisor |
| BHM Technologies | Unsecured Creditors Committee Financial Advisor |
| Birch Telecom | Unsecured Creditors Committee Financial Advisor |
| Champion Enterprises | Unsecured Creditors Committee Financial Advisor |
| ChemRx | Unsecured Creditors Committee Financial Advisor |
| Citadel Broadcasting Corporation | Unsecured Creditors Committee Financial Advisor |
| Coda Automotive | Debtor CRO & Restructuring Advisor |
| Communications Corporation of America | Debtor Restructuring Advisor |
| Delphi | Union Financial Advisor |
| Energy Conversion Devices | Debtor Liquidating Trustee |
| Enron | Debtor Restructuring Advisor |
| Fountainebleau | Mechanics Lien Holders Financial Advisor |
| Global Power | Unsecured Creditors Committee Financial Advisor |
| Golden Ocean | Debtor Restructuring Advisor |
| Granite Broadcasting Corporation | Ad-Hoc Equity Committee Financial Advisor |
| Handy Hardware | Debtor Plan Administrator |
| Hayes Lemmerz International | Unsecured Creditors Committee Financial Advisor |
| ICO / DBSD | 1st Lien Lenders Financial Advisor |
| iGPS Company, LLC | Unsecured Creditors Committee Financial Advisor |
| Immunicon | Unsecured Creditors Committee Financial Advisor |
| Internet | Unsecured Creditors Committee Financial Advisor |
| LSG Sky Chef | Debtor Restructuring Advisor |
| Motor Coach Industries | Unsecured Creditors Committee Financial Advisor |
| Nebraska Book | 2nd Lien Lenders Financial Advisor |
| Neoplan USA Corporation | Unsecured Creditors Committee Financial Advisor |
| Omega Navigation Enterprises, Inc. | 1st Lien Lenders Financial Advisor |
| Owens Corning | Ad-Hoc Equity Committee Financial Advisor |
| Pac-West Telecomm | Unsecured Creditors Committee Financial Advisor |
| Party City Corporation | Debtor Restructuring Advisor |
| Philadelphia Newspapers | Unsecured Creditors Committee Financial Advisor |
| Prison Realty Trust / Corrections Corporation of America | Debtor Restructuring Advisor |
| Six Flags | Ad-Hoc Noteholders Financial Advisor |
| Star Tribune | Unsecured Creditors Committee Financial Advisor |
| Supercanal | 1st Lien Lenders Financial Advisor |
| Trico Marine Services, Inc. | Unsecured Creditors Committee Financial Advisor |
| Truvo | Unsecured Creditors Committee Financial Advisor |
| Tultex | Debtor Restructuring Advisor |
| Washington Group International, Inc. | Debtor Restructuring Advisor |
| WHX Corporation | Official Equity Committee Financial Advisor |
| Winter Group | 1st Lien Lenders Financial Advisor |
| Worldspace Inc. | Secured Lenders Financial Advisor |



Case 4:13-bk-18188-EWH    Doc 98    Filed 11/18/13    Entered 11/18/13 12:00:00    Desc
Main Document        Page 41 of 46

## SELECT TESTIMONY / EXPERT REPORT EXPERIENCE

- Coda Automotive, Inc.
- Champion Enterprises
- Hayes Lemmerz International
- ICO / DBSD
- iGPS Company, LLC
- Immunicon
- Six Flags, Inc.
- Trico marine Services, Inc.

## SELECT NOTABLE SPEAKING ENGAGEMENTS

- Bingham McCutchen Distressed Debt Conference – 2011
- Credit Suisse High Yield Conference – 2010
- Kellogg Distressed Conference – 2008
- Debtwire Distress Market Conference – 2007
- TMA Conference, Tucson, AZ – 2006

## PRESENTATIONS & PUBLICATIONS

- Ch. 9: "Comparable Public Companies Analysis" Contributing Author, *Contested Valuation in Corporate Bankruptcy*, 2011
- Debtwire Distressed Market Survey, Contributing Author, 2006, 2007, 2008

## EDUCATION & CERTIFICATIONS

- Georgetown University, Bachelor of Science in Business Administration, Accounting Concentration
- Financial Industry Regulatory Authority (FINRA) Series 7, 63, and 79 licenses
- Certified Insolvency and Restructuring Advisor (CIRA)



**Appendix 4**

**Selected Financial Information**

# AJH, LLC
**Liquidation Trust Balance Sheet**
**Effective Date January 15, 2014**

| | Amount |
|---|---|
| **Assets** | |
| Cash on Hand at 1/15/14 (Assumed Effective Date) | $ 859,000 |
| Receivable from Promise | $ 500,000 |
| Receivable from City of Mesa | $ 383,000 |
| Accounts Receivable | $ 50,000 |
| Sierra Note and Cash | $ 275,000 |
| Total Assets | $ 2,067,000 |
| | |
| **Liabilities** | |
| Administrative Claims | $ 260,000 |
| Class 1 Priority Claims | $ - |
| Class 2 General Unsecured Claims | $ 12,007,566 |
| Class 3 Sierra Equity Claims | $ 3,211,676 |
| Class 4 De Lage Landen Claims | $ 48,388 |
| Avoidance Actions | Unknown |
| Litigation Claims | Unknown |
| Total Liabilities | $ 15,527,630 |
| | |
| **Equity** | $ (13,460,630) |
| | |
| Total Liabilities and Equity | $ 2,067,000 |

**Note:** All amounts are estimates based on the Debtors books and records and internal opinions of asset value, made solely for purposes of this analysis. No amount on this analysis should be used or relied on for any purpose other than this analysis.

**Appendix 5**

**Liquidation Analysis**

**AJH, LLC**
**Liquidation Analysis**

*All amounts are estimates, subject to change*

| | | Face Amount | | Estimated Amount | % Recovery | Plan | | Chapter 7 | |
|---|---|---|---|---|---|---|---|---|---|
| *Assets* | | | | | | | | | |
| | Cash on Hand at 1/15/14 (Assumed Effective Date) | $ | 859,000 | $ 859,000 | | $ | 859,000 | $ | 859,000 |
| | Receivable from Promise | $ | 500,000 | $ - | | $ | - | $ | - |
| | Receivable from City of Mesa | $ | 383,000 | $ - | | $ | - | $ | - |
| | Accounts Receivable | $ | 50,000 | $ 25,000 | | $ | 25,000 | $ | 25,000 |
| | Mesa Equipment related Note and Cash[1] | $ | 275,000 | $ 100,000 | | $ | 100,000 | $ | 100,000 |
| **Gross Assets** | | | | | | **$** | **984,000** | **$** | **984,000** |
| | | | | | | | | | |
| *Administrative Expense Claims (Unpaid)* | | *Face Amount* | | *Estimated Amount* | *% Recovery* | | | | |
| | Chapter 7 Trustee Fees | $ | 52,770 | $ 52,770 | 100% | $ | - | $ | 52,770 |
| | Chapter 7 Trustee Counsel and Advisor Fees | $ | 150,000 | $ 150,000 | 100% | $ | - | $ | 150,000 |
| | Squire Sanders (Debtor Counsel Fees)[2] | $ | 55,000 | $ 55,000 | 100% | $ | 55,000 | $ | 55,000 |
| | Odyssey Capital (CRO)[3] | $ | 60,000 | $ 60,000 | 100% | $ | 60,000 | $ | 60,000 |
| | Udall Shumway (Special Counsel)[4] | $ | 10,000 | $ 10,000 | 100% | $ | 10,000 | $ | 10,000 |
| | Elliott Greenleaf (Committee Counsel Fees) [5] | $ | 60,000 | $ 60,000 | 100% | $ | 60,000 | $ | 60,000 |
| | Quarles & Brady (Committee Local Counsel Fees) | $ | 15,000 | $ 15,000 | 100% | $ | 15,000 | $ | 15,000 |
| | Emerald Capital Advisors (Committee Financial Advisor) [6] | $ | 60,000 | $ 60,000 | 100% | $ | 60,000 | $ | 60,000 |
| *Total Administrative Expense Claims* | | | | | | $ | 260,000 | $ | 462,770 |
| **Net Proceeds After Administrative Expense Claims** | | | | | | **$** | **724,000** | **$** | **521,230** |
| | | | | | | | | | |
| *Priority Unsecured Claims* | | *Face Amount* | | *Estimated Amount* | *% Recovery* | | | | |
| | Priority Claims[7] | $ | - | $ - | 100% | $ | - | $ | - |
| **Net Proceeds After Priority Unsecured Claims** | | | | | | **$** | **724,000** | **$** | **521,230** |
| | | | | | | | | | |
| *Liquidation Trustee Expenses* | | *Face Amount* | | *Estimated Amount* | *% Recovery* | | | | |
| | Liquidation Trustee, Counsel, and Advisor Fees[8] | $ | 75,000 | $ 75,000 | 100% | $ | 75,000 | $ | - |
| **Net Proceeds After Liquidation Trustee Expenses** | | | | | | **$** | **649,000** | **$** | **521,230** |
| | | | | | | | | | |
| | | *Face Amount* | | *Estimated Amount* | | | | | |
| | Class 2 General Unsecured Claims[9] | $ | 12,007,566 | $ 12,007,566 | | $ | 510,420 | $ | 409,933 |
| | | | | | *% Recovery:*[11] | | 4.3% | | 3.4% |
| | Class 3 Sierra Equities Claims[10] | | Unknown | $ 3,211,676 | | $ | 136,523 | $ | 109,645 |
| | | | | | *% Recovery:*[11] | | 4.3% | | 3.4% |
| | Class 4 De Lage Landen Claims | | Unknown | $ 48,388 | | $ | 2,057 | $ | 1,652 |
| | | | | | *% Recovery:*[11] | | 4.3% | | 3.4% |
| | Class 5 Equity Interests | $ | - | $ - | | $ | - | $ | - |
| | | | | | *% Recovery:* | | 0.0% | | 0.0% |
| | **Total** | | | $ 15,267,630 | | | | | |

**Note:** All amounts are estimates made solely for purposes of this analysis. No amount on this analysis should be used or relied on for any purpose other than this analysis.

[1] Inlcudes $100k in cash and $175k in a note held by Sierra Consulting as the Receiver in the Mesa lease dispute.
[2] Estimate of three months at $35k/mo. less Squire Sanders's $50k retainer.
[3] Estimate of three months at $30k/mo. less Odyssey's $30k retainer.
[4] This estimated amount is net of Udall Shumway's $1,272 retainer.
[5] Estimate of three months at $25k/mo.
[6] Estimate of three months at $25k/mo.
[7] All Priority Unsecured Claims have been paid in full pursuant to the wage motion approval by the bankruptcy court.
[8] Actual costs to administer the liquidation trust will depend on the number and complexity of avoidance actions and litigation claims pursued by the liquidation trust, and the recoveries therefrom. The liquidating trustee has a greater probability of recovering material proceeds from the avoidance actions and litigation claims when compared to a hypothetical chapter 7 trustee because the liquidating trustee has previous knowledge and experience with the case having acted as financial advisor to the Committee.
[9] This balance does not include any claim with an "unknown" amount as listed in the schedules.
[10] Includes accrued rent and the capped lease rejection claim.
[11]
Does not reflect potential adjustments for creditors that did not receive a prepetition pro rata interim distribution in September 2013. The liquidating trustee has a greater probability of recovering material proceeds from the avoidance actions and litigation claims when compared to a hypothetical chapter 7 trustee because the liquidating trustee has previous knowledge and experience with the case having acted as financial advisor to the Committee.